W. Monroe STEPHENSON,
Plaintiff–Appellant,

v.

PAINE WEBBER JACKSON & CURTIS,
INC. and James E. Welch,
Defendants–Appellees.

No. 86–3515.

United States Court of Appeals,
Fifth Circuit.

March 15, 1988.

Michael J. Mestayer, New Orleans, La., for plaintiff-appellant.

Phillip A. Wittmann, Stephen H. Kupperman, George C. Freeman, III, New Orleans, La., for Paine, et al.

Robert J. Fineran, Mandeville, La., for Welch.

Before WISDOM, GARWOOD, and JONES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

In May 1984, Monroe Stephenson brought suit against Paine, Webber, Jackson & Curtis, Inc. ("Paine Webber"), and James Welch ("Welch"), a former Paine Webber broker, for trading securities on his behalf without authorization, which he alleged constituted a violation of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.;* the Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.*[1]; the Racketeer Influ-

enced and Corrupt Organizations Act ("RICO"); 18 U.S.C. § 1961, *et seq.;* and state law.[2] The district court dismissed the § 17(a), RICO, and state law claims as a matter of law pursuant to Fed.R.Civ.P. 12(b)(6), and dismissed the 10b–5 claim pursuant to Fed.R.Civ.P. 41(b) after finding that plaintiff had not carried his burden of proof and that the claim was otherwise barred by equitable defenses. On appeal, Stephenson challenges the district court's rulings as to all counts of the complaint and raises for the first time an alleged conflict of interest between the trial judge and defendant's counsel which, Stephenson submits, warrants recusal of the trial judge and a new trial.[3] We affirm the district court's judgment.

## I.

## BACKGROUND

In 1979, Stephenson, a tax attorney, opened several accounts in New Orleans with Paine Webber and shortly thereafter began trading in options with the assistance of James Sanders, a Paine Webber account executive. When, in early 1982, Sanders left Paine Webber, Stephenson's account was transferred to Welch, another broker in the local Paine Webber office. Stephenson resumed options trading through Welch and continued such trading until late 1983. After each trade in his account, Stephenson received a confirmation slip for the transaction from Paine Webber, and for each month there was activity in his account, he received a monthly account statement which provided detailed information about that activity, including the amount of each trade, the identity of each item traded, whether the trade was in a margin account, and the rate of interest charged on the margin account.

---

1. Specifically, the complaint implicates Rule 10b–5, 17 C.F.R. 240.10b–5 (1976) promulgated under § 10(b) of the 1934 Act, 15 U.S.C.A. § 78j(b) (1976).

2. Plaintiff also alleged violations of the Commodity Exchange Act, but that claim was later abandoned.

3. We refrain from passing on the merits of plaintiff's assertion, raised for the first time on

appeal, that the district judge and Paine Webber's counsel had an attorney-client relationship which would have warranted the judge's recusal. Plaintiff has waived any objection by not raising it at an earlier stage of the litigation. *See Delesdernier v. Porterie,* 666 F.2d 116, 121–23 (5th Cir.1982), cert. denied, 459 U.S. 839, 103 S.Ct. 86, 74 L.Ed.2d 81 (1982).

In October 1982, Stephenson was informed by telegram that he owed over $4,000 for a trade made on his behalf by Welch in September. According to Stephenson, that trade was clearly unauthorized, but he challenged only Welch, and not Paine Webber, about it. Welch allegedly promised to correct the error but failed in the following months to do so.

Stephenson ignored his December 1982 monthly statement from Paine Webber, looking only at the interest figure for his tax return. He did nothing at this point to see whether the purportedly improper trade of September 1982 had been corrected. Had he done so, he would have been alerted to what he now asserts were other unauthorized trades. Stephenson was aware in January 1983, however, that he had not received a promised positive interest spread on GNMA margin purchases.

In April 1983, Stephenson was informed by Welch that alleged errors in his account had not been corrected and in June, he received a mailgram confirming a bond purchase that he asserts was not authorized. Again, Stephenson complained only to Welch, and not to Paine Webber, of the "mistake." Nevertheless, Stephenson's account remained active and numerous trades were executed on Stephenson's behalf from May—August 1983, the period during which Stephenson's greatest losses were incurred. Stephenson admitted at trial, however, that he never opened a single confirmation slip or account statement until August of 1983 because, as he testified, he regarded them as "junk mail."

Not until August 24, 1983 did Stephenson issue his first formal written complaint, in the form of a letter hand-delivered to Welch regarding the handling of his account. The letter objected to only eleven (11) transactions, all of which had been made subsequent to June 21, 1983.

On August 31, 1983, Stephenson wrote a second letter similar to the first which was also hand-delivered to Welch. Finally, on September 15, Stephenson wrote a third letter which identified fifty-nine (59) [4] allegedly unauthorized transactions in his account. Each of these transactions had been reported in account statements and in confirmation slips transmitted to Stephenson between August 9, 1982 and August 22, 1983. Paine Webber was not aware of Stephenson's allegations until it received this third letter dated September 15, 1983.[5]

At trial, evidence was introduced to show that Paine Webber had not exercised sufficient supervision over Welch and that had it done so, the unauthorized transactions would have been brought to the attention of Paine Webber at a much earlier date so that further unlawful trading could have been prevented.

The district court concluded that Stephenson had failed to carry his burden of establishing the alleged violations of Rule 10b–5 by a preponderance of the evidence. In so finding, the court determined that in light of Stephenson's extensive financial training and experience,[6] his failure to take corrective action upon learning that his broker had made an error constituted reckless conduct. The court also relied on its observation of Stephenson's testimony as "simply not believable."

The court further held that Stephenson's securities claim was barred by the equitable defenses of laches, waiver, and ratification. Stephenson's disregard of the confirmation slips and monthly statements was found to constitute waiver of his right to sue for the allegedly unauthorized transactions, and it was held that his delay of at least eleven months in complaining of Welch's conduct [from October 1982 to September 1983] resulted in prejudice to Paine Webber and Welch so as to invoke the defense of laches.[7]

---

4. By the time of trial, the list of allegedly unauthorized transactions had grown to 67.

5. Welch was thereafter suspended from his position at Paine Webber for unauthorized trading.

6. Stephenson has business and law degrees, is an expert in federal income tax law, is intimate-

ly familiar with current accounting techniques, has been legal counsel in several securities fraud cases, and has been trading securities in the stock market since 1962.

7. The district court also found that Paine Webber's supervision of Welch, while perhaps slop-

## II.

## ANALYSIS

### A. The 10b–5 claim

At the close of appellant's case, the trial court dismissed his 10b–5 claim pursuant to Rule 41(b) of the Federal Rules of Civil Procedure. In reviewing a Rule 41(b) dismissal, "the district court's conclusions of law are subject to de novo review, but we may not disturb its findings of fact unless they are clearly erroneous." *Crisis Transp. Co. v. M/V Erlangen Exp.*, 794 F.2d 185, 187 n. 5 (5th Cir.1986). Accordingly, our scope of review of the district court's factual findings and weighing of the evidence is narrow.[8]

■ In order to demonstrate a violation of Rule 10b–5, the plaintiff must prove (1) a material misrepresentation or omission by the defendant, (2) scienter on the part of the defendant, (3) reliance, and (4) due diligence by the plaintiff to pursue his or her own interest with care and good faith. *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.1977), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). Our analysis in this case focuses on the due diligence element of the claim.

Prior to the Supreme Court's holding in *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976), *reh'g denied*, 425 U.S. 986, 96 S.Ct. 2194, 48 L.Ed.2d 811 (1976), many courts adopted a negligence standard in determining whether a plaintiff's duty of due diligence had been met. *See, e.g. Clement A. Evans & Co. v. McAlpine*, 434 F.2d 100, 103 (5th Cir.1970); *City National Bank of Fort Smith Ark. v. Vanderboom*, 422 F.2d 221, 230 (8th Cir.1970), *cert. denied*, 399 U.S. 905, 90 S.Ct. 2196, 26 L.Ed.2d 560 (1970). In *Ernst*, the Supreme Court held that

mere negligence on the part of a defendant cannot satisfy the scienter requirement for liability under 10b–5. This ruling prompted several circuit courts to reevaluate the appropriateness of a negligence standard in the due diligence context in view of the fact that negligence had been held inadequate to satisfy the defendant's intent requirement. The Fifth Circuit undertook this task in *Dupuy*, 551 F.2d 1005, and held that after *Ernst*, the relevant inquiry in determining due diligence is whether the plaintiff has "intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow." *Dupuy*, 551 F.2d 1005 at 1020 (citing W. Prosser, § 34 at 185 (1971)). This "recklessness" standard has been followed without exception in the Fifth Circuit.[9]

Stephenson principally contends that the Supreme Court's decision in *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) essentially abolished the due diligence requirement for private 10b–5 actions as well as the equitable defenses of estoppel, waiver, and ratification. Without citing any apposite language from *Bateman Eichler*, appellant asserts that because *Bateman Eichler* narrowed the availability of the *in pari delicto* defense in securities fraud cases brought by tippees, it correlatively expanded the scope of all private 10b–5 causes of action. We disagree.

*Bateman Eichler* neither discussed the elements of the plaintiff's cause of action under Rule 10b–5 (as it assumed they existed in the case) nor suggested that its principles govern any other equitable defenses

py or casual, was not unreasonable, and therefore not actionable.

8. *North Mississippi Communications, Inc. v. Jones*, 792 F.2d 1330, 1333 (5th Cir.1986); *Hersch v. United States*, 719 F.2d 873, 876–77 (6th Cir.1983); 9 C. Wright & A. Miller, Federal Practice & Procedure § 2376 at 248 (1971).

9. *See, e.g. Siebel v. Scott*, 725 F.2d 995 (5th Cir.1984), *cert. denied*, 467 U.S. 1242, 104 S.Ct.

3515, 82 L.Ed.2d 823 (1984); *Petrites v. J.C. Bradford & Co.*, 646 F.2d 1033 (5th Cir.1981); *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945 (5th Cir.1981); *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111 (5th Cir.1980); *Dupuy v. Dupuy*, 551 F.2d 1005 (5th Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).

than *in pari delicto*.[10] In the absence of support from the holding or even dictum of *Bateman Eichler*, Stephenson must rely solely on analogy to defeat the requirement of a plaintiff's diligence and the possibility of other equitable defenses. His analogy, founded on general references to the deterrent aspects of the federal securities laws, fails.

Although due diligence, equitable defenses and the *in pari delicto* doctrine are arguably related in that they inquire into a plaintiff's conduct, they are applied in decidedly different contexts. The doctrine of due diligence and equitable defenses, like waiver, laches, estoppel or ratification, require an investor to be attentive to *self-protection*, whereas *in pari delicto* applies where the plaintiff has failed in his duty of disclosure to *others*, e.g., where a tippee trades on the basis of inside information without disclosing that information. *Bateman Eichler's* holding results from the concern that insider trading may go largely undiscovered by law enforcement officials if tippees are *altogether precluded* by *in pari delicto* from bringing suit against tippers. Thus, *Bateman Eichler* specifically limits its holding regarding the inapplicability of the *in pari delicto* defense to situations where preclusion of suit would interfere with the enforcement of the securities laws. *See Bateman Eichler*, 472 U.S. at 310, 105 S.Ct. at 2629, 86 L.Ed.2d at 224.

The due diligence standard and the equitable defenses, contrary to Stephenson's reasoning, ultimately foster the same law enforcement goal as *Bateman Eichler*, but from a different perspective. We have rightly stated, "by requiring plaintiffs to invest carefully, the Court promotes the anti-fraud policies of the Acts and engenders stability in the markets." *Dupuy*, 551 F.2d at 1014. These standards relating to a plaintiff's conduct encourage an investor to complain promptly about violations of his or her rights and, in so doing, to enable those with authority to control wrongdoing before additional investors are injured. The SEC has from its inception encouraged diligence in stock transactions. *Straub v. Vaisman & Co.*, 540 F.2d 591, 597 (3d Cir.1976); *see also* Wheeler, *Plaintiff's Duty of Due Care under Rule 10b–5: An Implied Defense to an Implied Remedy*, 70 Nw.U.L.Rev. 561, 564–68 (1976). To eliminate diligence-promoting standards in private Rule 10b–5 causes of action by a false analogy with *Bateman Eichler*, would seriously undercut the objectives of the SEC and the securities law. *Bateman Eichler* does not eliminate the existing due diligence requirements nor does it contravene our continued recognition of the equitable defenses in Rule 10b–5 cases.[11]

■ This case demonstrates the wisdom of retaining the recklessness-due diligence standard for plaintiffs. Although it is not clear that Stephenson challenges the district court's finding of his recklessness, the district court's finding was not clearly erroneous.[12] We agree with the district court

---

**10.** We acknowledge that as a consequence of *Bateman Eichler*, it might be logically inconsistent for a court to bar the action of a plaintiff tippee, who knowingly received undisclosed material inside information, against his tipper on grounds of waiver, estoppel, or ratification. We express no opinion, however, on whether this necessarily or always follows from *Bateman Eichler* because that case, as the Court acknowledged, was disposed of on the pleadings and without the development of a record or other issues. In any event, such logic would not undermine the affirmative defenses in other sorts of cases, like this one, where the plaintiff did not participate in any securities law violation.

**11.** *James v. Meinke*, 778 F.2d 200 (5th Cir.1985), post-dates *Bateman Eichler* and does not suggest that the Supreme Court there modified the plaintiff's due diligence requirement for recovery; *Dahl v. Pinter*, 787 F.2d 985, 988 (5th Cir. 1986), cert. granted, — U.S. ——, 107 S.Ct. 1885, 95 L.Ed.2d 493 (1987), discusses the defense of equitable estoppel in tandem with *in pari delicto*, implying that estoppel remains a valid defense after *Bateman Eichler*.

**12.** This Court held that a number of factors may be used to gauge whether a plaintiff's conduct indicates a lack of due diligence amounting to recklessness so as to bar recovery, including: "existence of a fiduciary relationship, concealment of the fraud, opportunity for detection, [plaintiff's] position in the industry, sophistication and expertise in the financial community ... knowledge of related proceedings ... [and] whether the plaintiff initiated the transaction or pressured for a speedy resolution." *G.A. Thompson & Co. v. Partridge*, 636 F.2d 945, 955 (5th Cir.1981).

that Stephenson's delay in reporting the allegedly unlawful trades and his failure to read Paine Webber correspondence containing accurate and detailed information about his accounts, even after he became fully aware that those accounts were not being properly handled, rose above mere negligence to the level of recklessness.[13] Stephenson's high level of education, experience, and demonstrated prowess in financial and securities matters are a critical factor in our decision. Stephenson is well-versed in securities transactions. He has traded securities with personal funds for over twenty years, has participated in securities fraud litigation, and has had wide exposure to investment issues in his capacity as a tax attorney. Further, Stephenson had ample opportunity to attempt to rectify the alleged errors in his account. It was uncontroverted at trial that he knew of an "unauthorized" transaction in October 1982, that he knew it had not yet been corrected in April, 1983, and that an interest spread promised for Spring 1983 had not materialized. Throughout the entire period of alleged unauthorized trades, he received statements which he knew would have revealed the status of his accounts. He never read them. This is not a case in which an unsophisticated or trusting investor relied upon a broker's superior expertise or a close friend's accommodation. *Compare Petrites*, 646 F.2d 1033; *Dupuy*, 551 F.2d 1005; *Siebel*, 725 F.2d 995. Stephenson was sufficiently knowledgeable and in control of his affairs to have reviewed his Paine Webber statements, as most people do their monthly bank statements, and discern a pattern of error.

These facts, together with the district court's expressed doubt about Stephenson's credibility at trial, are sufficient to support its finding of recklessness.[14]

## B. The § 17(a) Claim.

■ Appellant next urges that this court recognize the existence of a private remedy under § 17(a) of the Securities Act of 1933.[15] While the Supreme Court has declined to express any view as to the availability of such an action,[16] the issue was addressed by this court at length in *Landry v. All American Assurance Co.*, 688 F.2d 381, 384–91 (5th Cir.1982), which held that § 17(a) of the Federal Securities Act of 1933 does not create an implied private cause of action. Landry was cited with approval in *Keys v. Wolfe*, 709 F.2d 413, 416 (5th Cir.1983) and has not been criticized or challenged in any subsequent opinion of this Court. We see no reason to question its propriety, and therefore affirm the district court's dismissal of the § 17(a) claim.

## C. The RICO Claim.

Appellant's contention regarding his RICO claim is likewise without merit. It is well settled in the Fifth Circuit that there must be a distinction between the RICO "person" and the RICO "enterprise."[17] Appellant failed to establish this distinction in his pleadings and at trial, and his RICO claim was therefore properly dismissed.

## D. The State Law Claims.

■ Appellant next challenges the district court's Rule 12(b)(6) dismissal of his

---

**13.** Because we affirm the trial court's Rule 41(b) disposition of plaintiff's claim, it is not necessary to analyze the apparent challenge by Stephenson to the court's alternative findings on the affirmative defenses raised by appellees.

**14.** In *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 528 (5th Cir. 1987), the Fifth Circuit recently noted the existence of authority stating that the receipt of confirmation slips, standing alone, does not provide sufficient notice of "churning" (trading in a client's account to generate commissions without regard to the client's interests). The panel, however, refrained from passing on this issue and went

on to find that the claimant had been adequately apprised of the churning violations. The court emphasized the need to consider each case on its own facts, and stressed that the claimant's high level of sophistication was a strong factor in its decision. *Id.* at 528. Our opinion here is not inconsistent with *Romano.*

**15.** 15 U.S.C. § 77q(a) (1976).

**16.** See *Bateman Eichler* at 472 U.S. 303 n. 6, 105 S.Ct. 2625 n. 6.

**17.** *Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122, 122–23 (5th Cir.1986).

claim brought under the Louisiana Unfair Trade Practices Act[18], La.R.S. 51:1401 *et seq.* (LUTPA). In holding this statute inapplicable to securities fraud cases, the district court relied on *Moore v. A.G. Edwards & Sons, Inc.,* 631 F.Supp. 138 (E.D. La.1986), the only case which has squarely addressed the issue.[19] We, like the *Moore* court, find persuasive the Fourth Circuit's analysis of a similar statute in *Lindner v. Durham,* 761 F.2d 162 (4th Cir.1985), and after examining the Act's legislative history and other state-provided remedies for securities fraud, we conclude that the statute is inapplicable in the present context.

The language of the statute is extremely broad and would seem at first glance to cover the type of situation presented here. Within its definition of unfair trade practices the act specifically includes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce", La.R.S. 51:1405(A), and leaves the determination of such unfair trade practices to a case-by-case analysis. However, several factors militate against allowing recovery under the act in securities fraud cases.

First, we note that treble damages are available under the LUTPA but not under Louisiana's Blue Sky Law. Had the Louisiana legislature intended the availability of treble damages in securities fraud cases, it would either have provided for such a remedy in its Blue Sky Law, or somehow indicated that the LUTPA was broad enough to cover securities violations.

Second, 1405(A) of LUTPA is patterned after, and nearly identical to, § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) (1982). Louisiana courts have found appropriate the use of federal decisions interpreting § 5 of the FTC Act in interpreting § 1405(A). *See, e.g., Guste v.*

*Demars,* 330 So.2d 123, 125 (La.App.1976). The FTC Act has been interpreted to preclude coverage of securities claims. Third, it appears that allowing securities actions under the act is inconsistent with the state statutory scheme for remedying securities violations in that it would create a functional overlap between the Governor's Consumer Protection Agency, which carries out investigative and enforcement duties under the Unfair Trade Practices Act, and the state banking commissioner whose responsibilities include enforcing the Blue Sky Law. Thus, we reject Stephenson's LUTPA claim.

The district court dismissed Stephenson's claim for emotional distress on the grounds that Louisiana law requires a non-pecuniary interest as the cause for emotional distress, and no such interest was present in this case. Because a district court is in a better position than are we to ascertain the law of the state in which it sits, *see infra* n. 18, we defer to its determination of Louisiana law on this issue, noting that the emotional distress claim also fails because plaintiff has not succeeded in demonstrating that any trades were "unauthorized" as that term is legally defined.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

**18.** The Louisiana Unfair Trade Practices Act provides in pertinent part:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

La.R.S. 51:1405(A)

**19.** Because no Louisiana court has settled this issue decisively, we must determine what the Louisiana courts would decide if confronted with this question. In such a situation, we accord substantial deference to the district court's determination of the law of the state in which it sits. *Edwards v. State Farm Ins. Co.,* 833 F.2d 535, (5th Cir.1987).