**Larry L. and Patricia A. LONGDEN, Allan C. and Joy T. McAllister, Bharat H. and Panna B. Barai, on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**Jeffrey S. SUNDERMAN, Arthur Andersen & Company, Linde Thomson, Fairchild, Langworthy, Kohn & Van Dyke, P.C., a Missouri professional corporation, Alfred C. Hagemann, Robert Thomson and Joseph Harter, Defendants.**

Civ. A. Nos. 3–87–0612–H, 3–86–1737–H, 3–87–0569–H, 3–87–0572–H, 3–87–0603–H, 3–87–0608–H and 3–87–0609–H.

United States District Court,
N.D. Texas,
Dallas Division.

May 1, 1990.

Terry Oxford, Susman & Godfrey, Dallas, Tex., Stewart Weltman, Much, Shelist, Freed, Denenberg, Ament & Eiger, Chicago, Ill., Craig Corbitt, Furth, Fahrner, Bluemle & Mason, San Francisco, Cal., for plaintiffs.

Dennis Wright, Hillix Brewer Hofhaus Whittaker & Wright, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND ORDER

SANDERS, Chief Judge.

Before the Court are the following pleadings:

(1) Defendants' Second Amended Motion for Summary Judgment, filed March 5, 1990;

(2) Plaintiffs' Response, filed March 26, 1990;

(3) Supplementation to Plaintiffs' brief in opposition, filed April 5, 1990;

(4) Defendants' reply, filed April 4, 1990;

(5) Plaintiffs' letter of transmittal with *Williams v. Khalaf,* 1990 Westlaw 33531, (Sup.Ct.Tex. Mar. 28, 1990);

(6) Defendants' Memorandum Regarding *Williams,* filed April 13, 1990.

In their motion for summary judgment, Defendants propose various grounds for summary judgment on all or portions of Plaintiffs' case. The Court has carefully considered the arguments and evidence presented, the pleadings, and the applicable law.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is an appropriate means of resolving issues in a case only when there is "no genuine issue as to any material fact," and the moving party is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party has the initial burden of showing the absence of disputes as to the material facts, to which the non-moving party must respond with its own evidence demonstrating the existence of a genuine factual dispute. *Celotex Corp. v. Catrett,* 477 U.S.

317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). "[I]f the evidence is such that a reasonable jury could return a verdict for the non-moving party," then summary judgment is improper. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

## II. BACKGROUND

This is a securities fraud class action by purchasers of limited partnership interests in 121 limited partnerships. The only remaining defendants in the case are the accounting firm of Arthur Andersen & Co., and two members of the firm, Alfred C. Hagemann, and Joseph D. Prelogar ("Defendants").

Plaintiffs allege that Defendants were intimately involved with Jeffrey Sunderman and the other defendants in creating and marketing the limited partnership interests. Plaintiffs further allege that the interests were virtually worthless when sold, and that the Defendants knew of and participated in the fraud perpetrated by Sunderman. Plaintiffs claim violations of SEC Rule 10b–5, common law fraud, and RICO.

## III. STATUTE OF LIMITATIONS

Defendants' primary argument for summary judgment is that virtually all Plaintiffs' claims are barred by the statute of limitations. To reach this conclusion, Defendants make assumptions regarding first, the applicable limitations periods, and second, the accrual date of Plaintiffs' claims. The Court examines each in turn.

### A. *Limitations Periods*
#### 1. CIVIL RICO

■ There is no doubt that the limitations period for civil RICO violations is 4 years. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987).

#### 2. COMMON LAW FRAUD AND 10b–5

■ There is substantial question, however, as to the limitations period for fraud and Rule 10b–5 violations in Texas. Until this spring, the common assumption was

that the limitations period in Texas for fraud was two years. *See, e.g., Chien v. Chen*, 759 S.W.2d 484 (Tex.App.–Austin 1988). Since the Fifth Circuit has held that the Texas statute of limitations for fraud applies to 10b–5 actions filed in federal court in Texas, *see Wood v. Combustion Engineering, Inc.*, 643 F.2d 339, 346 (5th Cir.1981), the limitations period for 10b–5 actions was also believed to be two years.

On March 28, 1990, however, the Texas Supreme Court determined that since 1979, the limitations period for fraud in Texas has actually been four years. *Williams v. Khalaf*, 1990 Westlaw 33531, at 6–7, —— S.W.2d at ——-—— (Sup.Ct. Mar. 28, 1990). Nothing in the reasoning in *Wood* implies that the Fifth Circuit only chose to apply the fraud statute of limitations to a 10b–5 violation because the period was two years; in fact, the Circuit explicitly disavowed considering the length of the limitations period. *See Wood*, 643 F.2d at 344 n. 11. Since the usual rule is that cases should be decided in accordance with the law existing at the time of decision, *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 662, 107 S.Ct. 2617, 2621, 96 L.Ed.2d 572 (1987), this Court is constrained to apply both Texas and Fifth Circuit law to find that the limitations periods for the fraud and 10b–5 violations in this case are both four years.

Defendants resist this conclusion on the grounds that a cause of action is governed by the statute of limitations in effect at the time it accrues, not as subsequently amended. *See Doran v. Compton*, 645 F.2d 440, 445 (5th Cir.1981). There are two problems with this argument. First, the Fifth Circuit case relied upon by Defendants construes *Texas* law, and the Supreme Court has recently stated otherwise for federal law. *See Goodman*, 482 U.S. at 662, 107 S.Ct. at 2621. Second, by this very principle, the four year period should apply since the Texas Supreme Court decided that the limitations period has been four years since the statutory change in 1979, and Plaintiffs' claims accrued at a later date. Moreover, the Texas Supreme Court applied its decision to the case before it.

A possible conflict arises, however, with *Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971). In an earlier case, *Rodrigue v. Aetna Casualty & Surety Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969) the Supreme Court had determined that certain claims had to be made under the Lands Act. In *Chevron,* the Court declined to apply the shorter limitations period required by the *Rodrigue* decision to a claim which had accrued prior to *Rodrigue.*

*Williams* is distinguishable from *Rodrigue* in that in *Williams* the Texas Supreme Court simply corrected a mistake regarding the *length* of time the limitations period ran for fraud claims, holding that a *longer* limitations period had been in effect since a statutory change. In *Rodrigue,* by contrast, the Court applied a different substantive law to certain claims requiring a *shorter* period.

The *Chevron* court stressed that substantial inequities should be avoided, and it did so by avoiding *barring* the plaintiff's claim. Here, Defendants ask the Court to accomplish the opposite result—to apply the decision only prospectively to *bar* Plaintiffs' claims. No substantial inequity will result if the Court applies Texas and Fifth Circuit law to Plaintiffs' claims. Only Defendants' expectation that they would be protected by a two-year limitations period is upset, while Plaintiffs are given the longer period to which they always have been entitled except for the mistaken reasoning of prior courts.[1] Thus, even under *Chevron's* balancing test, *see* 404 U.S. at 106–07, 92 S.Ct. at 355–56, retroactive (if it can be called such) application of the *Williams* decision is appropriate.

### B. *Date of Accrual of Claims*

Defendants proffer two possible dates for the accrual of Plaintiffs' claims. The earliest date is the date of the purchase of the securities. The next date is May 1, 1985. Plaintiffs assert that their claims did not accrue until March 1986. The Court will consider each date in turn.

### 1. DATE OF PURCHASE

The Fifth Circuit has decided that the "discovery" test should apply to determine when 10b–5 claims accrue. *Corwin v. Marney, Orton Inv.,* 788 F.2d 1063, 1068 (5th Cir.1986). The limitations period thus begins to run "only when the plaintiff discovers, or in the exercise of reasonable diligence should discover, the alleged violations." *Id.* Defendants contend that Plaintiffs' claims accrued at the time they purchased the securities because most of Plaintiffs' complaints relate to matters "known or readily discoverable by an investor exercising reasonable diligence when the securities were purchased." Defendants' Brief at 5.

Defendants argue this issue at length, but to no avail. Defendants are arguing the merits of Plaintiffs' claims in the guise of a statute of limitations defense by asserting that if Plaintiffs had exercised the due diligence required of sophisticated investors, they would have discovered the problems with the securities before they purchased them. A determination that Plaintiffs could have, and therefore should have, discovered their complaints when they purchased the securities would be tantamount to a holding that Plaintiffs failed on the merits by not establishing their due diligence in investigating the securities.

But Defendants are mixing up the two standards. To prove a 10b–5 claim, a plaintiff must show that he exercised due diligence in investigating the security. *Laird v. Integrated Resources, Inc.,* 897 F.2d 826, 837 (5th Cir.1990). The standard for due diligence is to avoid recklessness: "whether the plaintiff has intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it." *Id.,* quoting *Stephenson v. Paine Webber Jackson & Curtis Inc.,* 839 F.2d 1095, 1098, *reh'g denied,* 849 F.2d 901 (5th Cir.), *cert.*

---

1. Even the Fifth Circuit was mistaken. Confronted with the same argument presented to the Texas Supreme Court in *Williams,* the Circuit predicted that Texas courts would continue to apply a two-year statute to fraud claims. *See Coastal Distributing Co. v. NGK Spark Plug Co.,* 779 F.2d 1033, 1037–39 (5th Cir.1986). That case did not involve a securities fraud claim.

*denied,* 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 328 (1988). The standard for the accrual of a claim, however, is different: "only when the plaintiff discovers, or in the exercise of reasonable diligence should discover, the alleged violations." *See Corwin,* 788 F.2d at 1068. Defendants do not allege that Plaintiffs knew of the violations when they bought the securities. They allege instead that if Plaintiffs had exercised "reasonable diligence" at the time they bought their securities, they would have discovered their claims.

At the time they bought their securities, the investors were under no obligation to make a "reasonable inquiry" into the facts behind those represented in the PPMs. To so hold would overrule a long line of Fifth Circuit and other cases requiring only that the investor not be reckless, *see Stephenson,* 839 F.2d at 1098 and n. 9. Such a holding would also destroy the private action under Rule 10b–5. No investor would be allowed to rely upon the statements in a prospectus unless he personally investigated all the supporting facts.[2] And if a personal investigation is required, then what is the use of Rule 10b–5 at all? In a slightly different context, the Fifth Circuit stated

> We should always be wary of holding that a purchaser of securities, who deals with the corporate insider, could have found out omitted material facts by examining the corporate books or undertaking other extensive investigations. To do so is to allow the insider to present a mountain of information which they cannot possibly digest and excuse themselves from liability on the basis that they did not provide the right answers because they were not asked the right questions. Readiness and willingness to disclose are not equivalent to disclosure.

*Stier v. Smith,* 473 F.2d 1205, 1208 (5th Cir.1973) (citations omitted).

Defendants try to maneuver their way around this point by stressing the fact that the securities were restricted to "sophisticated" investors and investors assisted by

sophisticated advisers under SEC Rules 146 and 506, and Regulation D. But they presented no decisions changing either the due diligence or discovery standard for "sophisticated" investors. In fact, the Fifth Circuit recently affirmed the application of the recklessness standard to a sophisticated investor. *See Stephenson,* 839 F.2d at 1098, 1100. And on the discovery test, there is case law in this Circuit to exactly the opposite effect. In *In re Commonwealth Oil/Tesoro Pet. Sec. Litig.,* 484 F.Supp. 253, 257 (W.D.Tex.1979), the court considered a statute of limitations defense in a similar situation. The court held that an objective standard applies even to investors alleged to be sophisticated: the test is solely "whether the facts available would have put *a reasonably prudent investor* on 'inquiry notice' of the possibility that the ... statement contained misstatements and omissions, thus triggering the duty to act with due diligence and make reasonable inquiries." *Id.* (emphasis added).

The securities in *Tesoro* were not exempted under the SEC rules pertaining to sophisticated investors, and thus the holding is not determinative of this case. But the Court has been unable to find any cases in which the fact that a security is exempted from the exhaustive registration and reporting requirements of the SEC for public offerings changes the standards applied when allegations of fraud are made. In fact, the Fifth Circuit has held to the contrary.

The Circuit long ago stressed that "[a]lthough issues qualifying for the [sophisticated investors] exemption are excused from relatively onerous and expensive registration requirements, there remains the same high duty toward prospective investors as in a public offering." *Woolf v. S.D. Cohn & Co.,* 515 F.2d 591, 607, *reh'g denied,* 521 F.2d 225 (5th Cir. 1975), *vacated on other grds.,* 426 U.S. 944, 96 S.Ct. 3161, 49 L.Ed.2d 1181 (1976). In fact, the Circuit reiterated this holding when denying a rehearing, stating:

---

**2.** Defendants argued that a personal visit to each of the apartment complexes either by the investors or their advisers was required.

[A]buses in the area of private placements strike at the very heart of the protections the Securities Acts seek to afford investors, for, ... no requirements of reporting to the S.E.C. are imposed.... The scarce enforcement resources of the S.E.C. are adequate only to police the most flagrant and widespread abuses in the private placement area. The private action therefore arguably occupies an even more important place in the area of private placements than in other areas of Securities Act enforcement.... We wish to ensure that, on remand, the district judge will ... be aware of the stringent disclosure requirements our Court has held necessary in the private placement context.

521 F.2d at 227–28. *See also Stier*, 473 F.2d at 1207. ("[S]ophisticated investors, like all others, are entitled to the truth."); *Hill York Corp. v. American Int'l. Franchises, Inc.*, 448 F.2d 680, 696 (5th Cir.1971) ("[D]efendants' argument concerning the availability of information to the plaintiffs is equally unavailing here. The plaintiffs do not have to prove that they could not have discovered the falsity upon reasonable investigation. To put it simply, the availability of information elsewhere does not excuse misleading or incomplete statements.") (citation omitted); *Spatz v. Borenstein*, 513 F.Supp. 571, 580 (N.D.Ill.1981) ("[Defendant's] duty to disclose is not mitigated by the fact that [plaintiffs] may have been experienced investors. The securities laws entitle all investors, both the experienced and the novice, to the full and truthful disclosure of material information.").

Thus, unless a defendant can show that a plaintiff actually knew of his claim when he bought the security (a highly unusual circumstance), it would seem virtually impossible for a 10b–5 claim to accrue when an investor buys a security unless the claim is meritless because the investor has been reckless.

### 2. MAY 1, 1985

Defendants allege in the alternative that Plaintiffs' claims accrued May 1, 1985. They selected this date because Plaintiffs received notice that all the partnerships as well as Sunward and related entities had been placed in bankruptcy by mid-April 1985. According to Defendants, bankruptcy either begins the running of the limitations period as a matter of law, or else constitutes sufficient "storm warnings" to put Plaintiffs on notice that their investments were in jeopardy and they should investigate. *See Jensen v. Snellings*, 841 F.2d 600, 607 (5th Cir.1988).

No Fifth Circuit case to this effect has been presented by Defendants, but even accepting their characterization of the effect of the bankruptcy filings, under the recent Texas Supreme Court decision revealing that the statute of limitations for fraud (and thus for 10b–5) claims is four years, Plaintiffs timely filed their class action complaint in February 1988.

■ Alternatively, assuming that the limitations period is only two years, a genuine issue of material fact exists as to whether May 1, 1985 is the appropriate date for its commencement. While the law is clear that the limitations period begins to run when Plaintiffs have notice of facts which, upon investigation, would have led to actual knowledge, *see Jensen*, 841 F.2d at 606, Plaintiffs have submitted evidence tending to show that Sunderman and Anderson actively concealed the problems with the limited partnerships. Plaintiffs also allege that in 1986 Andersen threatened to withdraw from representing any investors who filed suit against them in the ongoing IRS audit. *See* Plaintiffs' Brief in Opposition at 37–39 and exhibits and deposition extracts referred to therein. Even if bankruptcy triggers the running of the limitations period as a matter of law, which the Court doubts, the allegation that Defendants concealed facts and/or prevented investors from filing suit against them creates a fact issue as to whether Plaintiffs could obtain access to the information allowing them to discover their claims even if they were on notice that they should investigate. *Jensen*, 841 F.2d at 607.

Finally, Defendants' argument that Plaintiffs have judicially admitted accrual of their 10b–5 claims, and/or that Plaintiffs' counsel has admitted March 1985 as the accrual date has already been over-

ruled. *See* Memorandum Opinion and Order, filed January 31, 1989, denying Defendants' Motion to Dismiss Counts II, III and IV of Fourth Amended Complaint, filed March 7, 1988.

Accordingly, Defendants' request for summary judgment on the grounds of a statute of limitations bar is DENIED.[3]

## IV. SUMMARY JUDGMENT ON THE MERITS

■ Defendants contend that they should be granted summary judgment on the 10b–5 claim because the evidence entitles them to judgment as a matter of law. To make out a claim under Section 10(b), Plaintiffs must establish: (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury. *Huddleston v. Herman & MacLean*, 640 F.2d 534, 543 (5th Cir.1981), *rev'd on other grds.*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983).

### A. *No Justifiable Reliance*

■ Defendants argue that because the PPMs were replete with cautionary language, Plaintiffs could not justifiably have relied upon the PPMs. They rely on cases primarily from the First and Eighth Circuits in asking the Court to rule that as a matter of law, Plaintiffs could not rely on the statements.

Defendants assert that they did not misrepresent anything because virtually all of the misrepresentations pointed to by Plaintiffs were actually disclosed somewhere in the PPMs. Plaintiffs dispute this characterization, but they also rely upon what they term the "buried facts" doctrine in *Isquith v. Middle South Utilities, Inc.*, 847 F.2d 186 (5th Cir.), *cert. denied*, 488 U.S. 926, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988), in arguing that for those misrepresentations for which Defendants claim full disclosure, the location, emphasis, and context of the disclosure must be considered to determine the adequacy of the disclosure. *See id.* at 203.

■ Defendants' reply is that *Isquith's* buried facts doctrine does not apply where, as here, the investors certify to the offerors that they are sophisticated investors. Sophisticated investors, according to Defendants, are held to a higher standard: they should be charged with a complete understanding of every nuance in the private placement memorandum. Defendants cite no law in direct support of their argument and the Fifth Circuit has implied to the contrary. *See Stier*, 473 F.2d at 1208. However, the sophistication of an investor is one of many factors that the jury may consider in determining whether the investor has exercised due diligence. *Stephenson*, 839 F.2d at 1099 n. 12.

Plaintiffs have provided sufficient proof of their own claims to withstand a motion for summary judgment. According to the evidence submitted, much of the most critical information in the private placement memoranda ("PPMs") was misleading. *See, e.g.*, Pl. Exhs. 12 at 52045770; 17 at 52060633. In any case, the adequacy of disclosure is quintessentially a jury question. *Isquith*, 847 F.2d at 208.

Moreover, the cautionary statements sprinkled throughout the PPMs are not dispositive. Plaintiffs have submitted evidence tending to show that Defendants knew that Sunderman's projections were unrealistic, and based upon a misleading appreciation base, and that Sunderman's prior offerings were failing even when they approved the PPMs. *See* Pl. Exhs. 5, 12, 13. In a similar case, the Fifth Circuit declared that "[t]o warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit." *Huddleston*, 640 F.2d at 544. Defendants have not proven to the Court that they are entitled to judgment on this issue as a matter of law.

### B. *Lack of Scienter*

■ The standard for scienter for purposes of primary liability was set forth in

---

**3.** Neither party presented briefing regarding the accrual date for Texas common law fraud cases, but it appears to be essentially the same discovery test. *See Coastal Distributing Co. v. NGK Spark Plug Co.*, 779 F.2d 1033, 1037 (5th Cir. 1986).

*Huddleston,* 640 F.2d at 544–45. "[S]cienter ... requires 'an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " *Id.* at 545, quoting *SEC v. Southwest Coal & Energy Co.,* 624 F.2d 1312, 1321 n. 17 (5th Cir. 1980). Circumstantial proof may be used by a jury in inferring such intent. *Huddleston,* 640 F.2d at 545.

■■■ The standard of scienter required to establish aider-and-abettor liability is different and consists of three parts. "(1) There must have been a securities violation by the primary party; (2) the aider and abettor must have had a 'general awareness' of its role in a rule 10b–5 violation; and (3) the aider and abettor must have knowingly rendered 'substantial assistance' in the rule 10b–5 violation." *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1126 (5th Cir.1988), *reh'g denied en banc* 863 F.2d 882, *vacated Fryar v. Abell,* —— U.S. ——, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). The panel noted that liability as an abettor would not attach where the assistance amounted to " 'no more than transactions constituting the daily grist of the mill.' " *Id.,* quoting *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir. 1975).

Defendants' entire proof on this matter consists of conclusory statements by top executive officers of Andersen to the effect that Andersen provided only standard accounting services, *see* Defendants' Motion for Summary Judgment at 4, ¶ 6, and that Andersen was entitled to rely on the law firm's opinion letter that there was adequate disclosure in the PPMs. Such evidence is insufficient to support a finding that Andersen did not possess the requisite scienter, since Plaintiffs have introduced contradictory evidence. *See* Pl. Exh. 5.

### C. *Anderson Owed No Duty of Disclosure*

■■■ Defendants argue that they owed no duty of disclosure to the purchasers of the securities beyond the information contained in the compilation and audit reports. This would be true in cases in which the accounting firm performed no more than normal or traditional services for the offeror. *See Rudolph· v. Arthur Andersen & Co.,* 800 F.2d 1040, 1044 (11th Cir.1986). As noted above, however, Plaintiffs have alleged, and the Court cannot find as a matter of law that this is not true, that Andersen was far more deeply involved with Sunward than was normal and that Andersen employees participated in activities for Sunward and Sunderman which compromised their independence. *See* Plaintiffs' Brief in Opposition at 12, ¶ 26. Accordingly, the issue of Andersen's duty to disclose must go to the jury.

### D. *No Falsity, Materiality, Proximate Causation, or Damages*

Defendants conclusorily state that Plaintiffs cannot prove these elements. Since Plaintiffs contest this assertion summary judgment is inappropriate.

### V. SUMMARY JUDGMENT ON COMMON LAW FRAUD AND RICO CLAIMS

Defendants move for summary judgment on both claims based upon their arguments regarding the 10b–5 violations. Since summary judgment has not been granted on the 10b–5 claims, the other claims still stand.

### VI. SUMMARY JUDGMENT ON ALL COUNTS WITH RESPECT TO THE 37 PPMs IN WHICH NO ANDERSEN REPORT APPEARED

Defendants claim that they can only be found liable for offerings which included an Andersen report. In opposition, Plaintiffs assert that Andersen's involvement with Sunderman and Sunward was so pervasive that Defendants may be held liable even for those in which it does not appear.

■■■ The Court will consider each of Plaintiffs' supporting allegations in turn,

but before doing so, the Court notes two important points. First, fourteen of the PPMs were created and sold before Andersen even became associated with Sunderman. Defendants' Motion for Summary Judgment at 3, ¶ 3. As to these fourteen, no liability can attach to Defendants.

 The second point is that no allegations have been made that Defendants in any way participated in the creation of the other 23 PPMs. The only allegations, and they are considered below, are that Andersen "stood behind" *all* of the PPMs.

## A. *Plaintiffs' Allegations*

1. "Andersen knew that its association with Sunward was critical to Sunward's marketing success. Hagemann Dep. at 261–64." [4]

Hagemann made no such statement in the cited portion of his deposition. The closest statement was his response that he did not remember whether Sunderman had ever explained why it was important to have Andersen involved in the offerings. *See id.* at 262.

2. "With Andersen's knowledge, Sunderman used Andersen as a reference even for offerings on which Andersen had not done the compilation projection work. Sunderman Dep. at 421–22, 425, 427."

Sunderman did not testify that Andersen knew that it was being used as a reference. It is true, however, that Andersen's name appeared on a separate document listing references, and Sunderman testified that he would refer broker/dealer due diligence officers to Andersen because Andersen did Sunward's annual audits, *id.* at 425, even on those deals where another accounting firm did the projections. *Id.* at 427.

3. "Andersen actively participated in Sunward's marketing efforts by[:]

"[a] attending general marketing meetings to answer questions from broker/dealers and/or sales representatives (referred to collectively as "BDs") (Braziel Dep. at 70–76);"

Braziel testified that Hagemann spoke in support of Sunward at a group sales meeting in Dallas on one occasion, *id.* at 73–76, but the date of that meeting is unclear.

"[b] answering letters and telephone calls from BDs (Hagemann Dep. at 119; Harrison Dep. at 172–81; Braziel Dep. at 70–86);"

Braziel's testimony concerns only calls made to Andersen *after* the purchase of the securities. Braziel Dep. at 71–72, 82–86. Harrison testified that he spoke to Hagemann over the course of a couple of years, but his only examples pertained to the PPMs in which Andersen reports appeared. Hagemann's testimony is to the same effect.

"[c] and meeting with members of larger BD houses. Exh. 16, at 52049213."

This exhibit is an undated analysis of Andersen's billings of Sunward and related entities, and reflects a meeting with Shearson American Express, and a due diligence consultation with brokers, investors, and investor advisors.

4. "Hagemann told one BD that Andersen stood behind Sunward's projections and believed them to be economically sound. Hagemann Dep. at 172–81."

The projections referred to were only those in reports prepared by Andersen.

5. "Numerous sales representatives testified that Andersen's association with Sunward made Sunward more marketable by providing an aura of respectability, reliability and economic soundness that Sunward would otherwise not have had. Harrison Dep. at 186, 196–200; Braziel Dep. at 347–39."

With reference solely to those PPMs in which no Andersen report appeared, all of these allegations totalled amount, at best, to (1) referrals of BDs to Andersen, even on deals in which no Andersen report appeared, though the consistent testimony is that Andersen only answered questions with regard to those deals in which it participated; (2) Hagemann's appearance at one sales meeting at an unspecified date where he told investors that Andersen

---

**4.** All of the quotations in this section come from Plaintiffs' Brief at 12, ¶ 26.

stood behind Sunward; and (3) the reliance placed by investors upon Andersen's association with Sunward.

### B. *The Law on 10b–5 and RICO Violations*

In *Abell*, 858 F.2d at 1125–26, the Fifth Circuit refused to hold a law firm primarily liable under the securities law where its name appeared in the prospectus, but it did not sign any documents included in the offering. The law firm was also not liable as an aider and abettor, since the activities it performed for its counsel were simply those performed by any law firm such as rewriting some of the statements in the prospectus. *Id.* at 1128. No liability attached even though the law firm knew that its client was under investigation by the SEC, and the law firm failed to investigate properly the truth of the offering statement.

In this case, there is no evidence at all that Andersen participated in *any* way in the preparation of the PPMs in which its name did not appear. At most, Andersen lent its aura of respectability to Sunward as a whole. Without more, Andersen cannot be held liable under the "conscious intent" standard of *Abell*.

An even more conclusive case is *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490 (7th Cir.1986), a Seventh Circuit decision with very similar facts to those in this case. In *Barker*, the accounting firm's name did not appear in the selling documents. Also as here, the accounting firm did not review or approve of the materials used to sell the securities and did not receive any proceeds from the sales, although, again as here, it did prepare the seller's financial statements which were not used in the offerings. *Id.* at 493–94. *See also In re Gas Reclamation, Inc. Sec. Litig.*, 659 F.Supp. 493, 505 (S.D.N.Y.1987) (where accountant did not perform an audit or assist in preparation of prospectus, no duty of disclosure), and cases cited therein.

Under both *Abell* and *Barker*, Andersen cannot be held liable either primarily or as an aider and abettor for violations of the securities laws for securities in which its name did not appear and the sale of which it did not actively support with conscious knowledge of the falsity of the representations. The one allegation of Hagemann's speaking during the BDs' trip to Dallas is not sufficiently tied to the twenty-three PPMs in which an Andersen report did not appear to be adequate evidence for a jury to infer liability. Accordingly summary judgment on the 10b–5 and the RICO claims (which require a securities violation as a predicate) is granted.

### C. *The Law on Common Law Fraud*

 Remaining to be determined is whether Andersen can be held liable for common law fraud with regard to these PPMs. Under Texas law, a plaintiff may recover for fraud upon establishing the nondisclosure of a material fact which the defendant had a duty to disclose. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex.1986, no writ).

The conclusion in *Abell* and *Barker* was that as a matter of federal law, an accounting firm has no duty to disclose when it is not an active participant in either the preparation or selling of the securities. The same finding also holds under Texas law, since fraudulent concealment must be based upon an affirmative duty to disclose, such as a confidential or fiduciary relationship between the parties. *Tempo Tamers, Inc. v. Crow–Houston Four, Ltd.*, 715 S.W.2d 658, 669 (Tex.App.—Dallas 1986).

In *Tempo Tamers*, the plaintiff and defendant had an even closer relationship than here: they were lessor/lessee. Yet the court still held that the defendant had no obligation to affirmatively disclose information to the lessee. Here, no fiduciary or confidential relationship existed between the investors and Andersen with regard to the twenty-three PPMs which did not contain Andersen's name. Accordingly, Andersen had no duty to disclose under Texas law and summary judgment must be granted on the common law fraud count as to the 37 PPMs in which no Andersen report appeared.

## VII. FRAUD ON THE MARKET

Defendants' final assertion is that they are entitled to summary judgment on Plaintiffs' reliance on the "fraud on the market" theory. The theory requires that the securities be "patently worthless" when sold. *Abell*, 858 F.2d at 1122.

As Defendants point out, each limited partnership owned and operated a real apartment building that had some value. Plaintiffs do not dispute that each limited partnership owned an apartment building. What they rely upon is the finding by their experts that 86% of the limited partnerships with appraisals containing a 5–year estimate held assets which independent appraisers had determined would, five years after the sale of the securities, be worth less than the initial capital investment. Baen Dep. at 320.

The fraud on the market theory developed in 10b–5 cases to allow plaintiffs to shift the burden of proving reliance onto defendants when plaintiffs did not read or rely upon the offering, but relied instead upon the efficiency of the markets for the securities to set the correct price. The idea was that professional investors and advisors read the information set out in a prospectus, and bid for the securities accordingly. Thus, whatever price a security commands in the market accurately reflects its value, and investors who do not read an offering statement may indirectly rely upon the statements contained therein via the judgments (as reflected in the market price) of those who do. In short, the market price becomes a substitute for what the investor would have determined if he had read the prospectus himself.

But this hypothesis only holds for securities for which all relevant information is known. When a seller of a security misrepresents or withholds information from the market, then the market price is likely to be distorted. The seller is then considered to have committed a fraud not just upon the individual investor, but upon the entire market, so long as he can prove that the sellers' nondisclosure materially affected the market price.

The fraud upon the market theory is based upon the existence of an efficient market where the securities are freely traded. Even where no efficient market exists however, the Fifth Circuit has determined that a plaintiff can obtain the fraud on the market presumption if he can show that the defendants conspired to bring to the market securities that were not entitled to be marketed. *Abell*, 858 F.2d at 1121. The idea is that "[t]he securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the market place." *Shores v. Sklar*, 647 F.2d 462, 470–71 (5th Cir.1981), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983).

"Not entitled to be marketed," according to the Fifth Circuit, means that the securities were "patently worthless" when sold. *Abell*, 858 F.2d at 1122. But patently worthless does not mean that the securities have no assets behind them, for "saleable assets may bless even the most worthless enterprise." *Id.* Instead, the focus is on the enterprise itself, and whether it had any value. Or as the Fifth Circuit put it, the promoters must know "that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendants' fraudulent scheme." *Id.* at 1122–23.

What the Court can glean from this reasoning is that the fact that the limited partnerships possessed apartment buildings does not necessarily refute Plaintiffs' claim of worthlessness. The true test is whether Sunderman's "game plan" of renovating the apartments, acquiring new tenants who could afford the higher rents, and later reselling the complexes never had any chance of success.

Plaintiffs have met their summary judgment burden by presenting evidence tending to show that Andersen knew that many of the projects were valueless from the start. *See, e.g.*, Baen Dep. at 320. Accordingly, this issue must be presented to the jury.

CONCLUSION

Defendants' Motion for Summary Judgment is GRANTED IN PART AND DENIED IN PART. All claims relating to the 37 PPMs which do not contain an Andersen report are STRICKEN. In all other respects, Defendants' Motion for Summary Judgment is DENIED.

SO ORDERED.