**NATIONAL WESTERN LIFE INSURANCE COMPANY,**
Plaintiff,

v.

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Defendant.**

**No. 93 CIV. 7244 VM.**

United States District Court, S.D. New York.

Aug. 16, 2000.

Benjamin Zelermyer, Steven A. Coploff, Serchuk & Zelermyer, White Plains, NY, for National Western Life Insurance Company, plaintiffs.

Grant Aram Hanessian, Baker & McKenzie, Grant Aram Hanessian, Duane Morris & Heckscher LLP, New York City, for Merrill Lynch, Pierce, Fenner & Smith, Inc., defendants.

## OPINION AND ORDER

MARRERO, District Judge.

This action was commenced in the Southern District of Texas in May 1993 and later that year transferred to this Court, where the underlying transaction remains governed by Texas law. During its seven-year odyssey to date, the case has passed through the dockets of five federal judges, four of them in this District. Yet, as described below, largely on account of the parties' own pretrial motion practice, the litigation remains no further along than a motion to dismiss the complaint, which itself is now in its third version.[1] Now before the Court is defendant's fourth such motion. In the mean-time, a number of people who played critical roles in events dating to 1989 which gave rise to the lawsuit have died or are no longer associated with the parties and consequently not readily available to testify.

This Court hopes to cut short any further pretrial skirmishing in this action, even if it may ruin its prospects to rank alongside *Jarndyce and Jarndyce* in the legends of legal intricacy and longevity. It is time for the parties to bring their encounter out in the open before a jury. For the reasons described below, defendant's motions are granted in part and denied in part. The parties are directed to proceed forthwith with completion of pretrial discovery in contemplation of advancing to a trial on the merits of the remaining issues within no longer than 60 days.

## FACTS

### A. The Parties and Jurisdiction

Plaintiff National Western Life Insurance Co. ("National Western") is a Texas-based corporation incorporated in Colorado. Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), is a Delaware corporation whose principal place of business is in New York. The action was originally filed in the Southern District of Texas in May 1993 and transferred to this court in October 1993 pursuant to 28 U.S.C. § 1404(a). The Court has diversity jurisdiction over this dispute pursuant to 28 U.S.C. § 1332.

### B. The Transaction

The parties' dispute involves allegations of fraud and securities violations arising out of a mortgage loan on a cooperative

---

1. In earlier proceedings, Judge Knapp reserved decision pending further briefing by the parties on the issue of the extent of plaintiff's sophistication as an investor. *See National Western Life Insurance Co. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 93 Civ. 7244, 1997 WL 328077 (S.D.N.Y. June 16, 1997). In a proceeding before Judge Buchwald following two subsequent reassign-ments of the case, defendant renewed its motion. Judge Buchwald expressed reservations over whether the sophisticated investor issue represented the law of the case and requested the parties to re-brief their respective positions. The case was then reassigned to this Court, where the current motions were resubmitted and fully briefed.

residential building in New York City (the "Property"). In March 1989, National Western purchased from Merrill Lynch a $3 million sub-participation interest in a $12 million mortgage loan on the Property. National Western's action relates to Merrill Lynch's role in the sale of this sub-participation interest.

The Property, located in a Manhattan building known as "401 East 89th Street", was converted into a cooperative unit pursuant to an Offering Plan filed in August 1988 with the Attorney General of the State of New York. According to the Plan, the building would be converted to a two-unit condominium, with the first unit consisting of the ground floor commercial space and the garage, and the other unit comprising the Property with its 198 residential apartments. The Plan specified that the conversion of the Property to cooperative ownership would occur pursuant to a non-eviction plan, which would allow non-purchasing tenants then residing in rent-regulated apartments to remain in occupancy on lease terms and rents calculated in accordance with state law.

On January 25, 1989, Gracie Associates, the owner of the Property and sponsor of the Offering Plan (the "Sponsor"), transferred title to the residential portion of the building to a Cooperative Corporation controlled by the Sponsor (this transaction is here referred to as the "Conversion Closing" and the corporation as the "Cooperative"). The Cooperative allocated its shares proportionately among the Property's 198 apartments. Shares of the Cooperative corresponding to the apartments were offered for sale by the Sponsor. At the time of Conversion Closing, 61 units had been sold. Of the remaining unsold apartments, 48 were vacant, and the remaining 89 were occupied by rent-stabilized tenants. Thus, the Sponsor remained obligated for the monthly maintenance charges pertaining to 137 apartments, in full with respect to the vacant units and, as regards the occupied apartments, in effect for the difference between each apartment's actual maintenance charge and the amount of stabilized rent the Sponsor collected from the tenant. Contemporaneous with the Conversion Closing on January 25, 1989, the Cooperative obtained a loan from CorEast Savings Bank ("CorEast") for $12 million plus interest. CorEast, through a Participation and Servicing Agreement on January 26, 1989, sold 100% of its interest in the loan to Merrill Lynch Mortgage Capital, Inc. ("ML Mortgage") and remained as the loan servicing bank. On March 1, 1989, ML Mortgage and its affiliate, defendant Merrill Lynch, entered into an agreement whereby the latter purchased from ML Mortgage a 25% sub-participation interest in the CorEast loan. On the following day, Merrill Lynch assigned its rights under the Sub-Participation Agreement to National Western in exchange for National Western's payment of $2,816,215 (the "Transaction").

In November and December of 1990, the Cooperative defaulted on its monthly payments on the CorEast loan, and then made only partial payments on the loan in February, March, and April 1991. On February 27, 1991, the Sponsor was forced involuntarily into Chapter 11 Bankruptcy proceedings, although this fact allegedly was not known to National Western at the time. National Western contends it learned that the Cooperative defaulted on its obligations under the CorEast loan "in or about July or August 1991" (Compl.¶ 70). In May 1993, National Western instituted this action in the Southern District of Texas, which granted Merrill Lynch's motion to transfer the case to the Southern District of New York in August 1993. National Western's second amended complaint, on which this action is based, was filed in this Court in October 1993.

## C. *The Transaction Documents*

At the center of this controversy are several documents containing terms relating to the Transaction and information

about the Sponsor, the Property and the Cooperative. These documents include an Offering Summary (the "Offering Summary"), an appraisal of the Property (the "Appraisal"), an Assignment and Assumption agreement between Merrill Lynch and National Western, and the August 1988 Offering Plan filed with the State. National Western's claims are founded on alleged misrepresentations and omissions in the Offering Summary and the Appraisal.

The Offering Summary, which the Complaint states was provided to National Western in connection with the Transaction, contains a "Summary of Terms" and an extensive description of the finances of CorEast. It notes that the security for the mortgage loan was a first lien only on the condominium unit comprised of the 198–unit residential portion of the Property, which is the cooperative owned by "401 East 89th Street Owners, Inc." The Summary also lists the Sponsor as "Gracie Associates", and gives an address for it at "c/o D.B.G. Property Corp./Arrandale Management Corp./Aegis Planning, Inc." in Manhattan. According to the Offering Summary, the Appraised Value of the Property was $41,135,000, based on the Future Sellout Value of the Cooperative as determined by "an appraisal performed by Wm A. White/Tishman East, Inc. on January 24, 1989." On the basis of this Appraised Value, the Loan–to–Value Ratio was represented to be 29.17%.

The Offering Summary also informed prospective purchasers that the Appraisal was available on request. The Complaint, however, alleges that National Western was provided and relied on "all or portions" of the Appraisal. National Western does not explicitly specify which, if any, parts of the Appraisal it actually received. But the Complaint cites the Appraisal as the source of a representation that the fair market value of the Property as rental was $20 million.

### D. National Western's Claims

National Western claims that Merrill Lynch knowingly or recklessly provided or withheld erroneous and misleading information about the financial condition of the Sponsor and about the value of the Property in order to induce National Western to participate in the Transaction, and that National Western relied to its detriment on the information it was given. Specifically, National Western's allegations rest on two forms of material omissions or representations. The first claim centers on the financial condition of the Sponsor. National Western asserts that the Offering Summary purposefully omitted essential facts about the finances of the Sponsor and suggested through the omission that the financial condition of the Sponsor was irrelevant. The second claim relates to the fair market value of the Property. National Western maintains that the Offering Summary misrepresented the value of the investment by miscalculating the future sellout value and by reflecting that figure while omitting disclosure of the rental value. Finally, National Western contends that the rental value set forth in the Appraisal was false and misleading in material ways. On these grounds, National Western claims that Merrill Lynch's representations and omissions constituted (1) violations of the Texas Securities Act, (2) common law fraud, (3) negligent misrepresentation and (4) breach of fiduciary duty. Merrill Lynch has moved under Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss the allegations of fraud, securities violations and negligent misrepresentation, and for summary judgment under Rule 56 with regard to the breach of fiduciary duty claim.

### DISCUSSION

### I. MOTION TO DISMISS

#### A. Standard of Review

On a motion pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss a complaint for failure to state a claim upon which relief can be

granted, the court must "tak[e] as true all allegations in the complaint, and draw[ ] all reasonable inferences therefrom in the [plaintiff's] favor." *Koppel v. 4987 Corp.,* 167 F.3d 125, 130 (2d Cir.1999) (quotations omitted); *accord Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). A court must not dismiss the complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) (citations omitted).

In addition to facts stated in the complaint, under Rule 10(c), "[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes." Fed.R.Civ.P. 10(c). While the Court normally looks to allegations in the complaint in deciding a motion to dismiss, it may also consider authentic documents that plaintiffs rely upon in bringing suit. "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." · *Cortec Indus., Inc. v. Sum Holding, LP,* 949 F.2d 42 (2d Cir. 1991). Otherwise, when matters outside the pleading are presented to and not excluded by the Court, the motion may be treated as one for summary judgment pursuant to Rule 56. *See* Fed.R.Civ.P. 12(b)(6).

### B. *Documents Before the Court*

Here, a threshold issue has arisen as to what papers are properly before the Court on this motion. The Complaint acknowledges that in connection with its purchase of an interest in the Property, National Western was provided "a document entitled Offering Summary and all or portions of an appraisal incorporated therein." (Compl.¶ 23). However, neither document is attached to the Complaint as an exhibit or specifically incorporated in it by reference. *See Cosmas v. Hassett,* 886 F.2d 8, 13 (2d Cir.1989) (citing *Goldman v. Belden,* 754 F.2d 1059, 1066 (2d Cir.1985) for the proposition that limited quotation of a document not otherwise attached or relied upon does not constitute incorporation by reference). National Western also alleges that in deciding to purchase the sub-participation interest from Merrill Lynch, it "reasonably relied on the representations contained in *both* the Offering Summary and the appraisal incorporated therein." (Id. ¶ 24, emphasis added) The Complaint does not explicitly specify the particular pages or sections of the Appraisal National Western concedes it received and relied upon, constituting one of the factual issues which renders the action difficult to dispose of entirely by way of a motion to dismiss, as Merrill Lynch persistently has endeavored to do.

In order to fill that gap, Merrill Lynch submitted, along with its papers supporting the present motion, copies of the Offering Summary and the entire Appraisal, as well as other materials outside the pleadings.[2] It argues that because National

---

2. This material includes a copy of National Western's complaint in the pending action of *National Western v. Robert Von Ancken,* 95 Civ.1987(wk), an action which National Western filed in this Court against the firm that prepared the Appraisal and in which National Western states that it relied on the Appraisal in purchasing the sub-participation interest at issue here. On a motion to dismiss the court may also consider, by judicial notice, documents and filings on the public record that plaintiff relied upon in drafting the complaint. National Western's complaint in its action against the appraiser may be a public document of which the Court may take judicial notice. In *Kramer v. Time Warner, Inc.,* 937

F.2d 767 (2d Cir.1991), the Second Circuit stated:

it is highly impractical and inconsistent with Fed.R.Evid. 201 to preclude a district court from considering such documents when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions. First, the documents are required by law to be filed with the SEC, and no serious question as to their authenticity can exist. Second, the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents

Western's claims rely upon these documents, Merrill Lynch may offer them and properly place them before the court without converting its Rule 12(b)(6) motion to dismiss into a motion for summary judgment under Rule 56. In support of this proposition Merrill Lynch cites *Cortec Indus.*, 949 F.2d at 48.

In response, National Western distinguishes *Cortec Industries,* arguing that the case applies only when plaintiff, as the foundation for the cause of action as stated in the complaint, actually has reviewed and relied upon the entire documents defendant places before the court on the motion to dismiss. Thus National Western contends that, without converting Merrill Lynch's motion into one for summary judgement, there is no basis for assuming that National Western, at the time its action accrued, saw portions of the Appraisal which are nowhere specified in the Complaint as constituting the source of the representations which gave rise to its claim. Merrill Lynch replies in supplemental correspondence that in fact its original motion was framed in the alternative, either as one to dismiss pursuant to Rule 12(b)(6) or for summary judgment, thereby apparently inviting the Court to exercise discretion under Rule 12(b)(6) to convert the entire motion into one for summary judgment.

The pleadings and cat-and-mouse motion practice in this case thus demonstrate some of the hallmarks of epochal litigation in the making. First are plaintiff fraud claims deftly crafted and shielded with seemingly meticulous imprecision, to that extent prompting defendant to pursue the pleadings—with some justification, as the Court here concludes—as though a moving target, a complaint still in search for a cause of action. Second is a defense apparently intent on pushing the envelope of the Rule 12(b) dismissal motion to the limits of its elasticity, prodding daringly beyond the pleadings right up to the border of summary judgment standards under Rule 56. And third are two litigants both endowed with institutional fortitude and fortunes to feed litigation, as well as counsel consummately skilled in the pretrial art of dodging their pleadings' bullets.

The Court believes it would not serve the interests of justice and efficient management of this case to treat Merrill Lynch's motion as one for summary judgment at this juncture of these proceedings. To do so inevitably would invite further delays and extend the ultimate resolution of the merits of a dispute that already has been excessively prolonged. Accordingly, declining to engage the parties' pre-trial sparring, the Court does not base any part of its determination on any of the documents outside the pleadings placed before the Court by Merrill Lynch beyond those National Western itself employed in bringing this lawsuit.

Accepting, as the Court must, the factual allegations in the Complaint as true and resolving doubts and drawing reasonable inferences in plaintiff's favor, the Court concludes that because National Western acknowledges it was provided a copy of the Offering Summary and because it refers to and relied upon that document as contain-

---

but only to determine what the documents stated. Third, a plaintiff whose complaint alleges that such documents are legally deficient can hardly show prejudice resulting from a court's studying of the documents. Were courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure. *Id.* at 774.
*See also Lovelace v. Software Spectrum Inc.,* 78 F.3d 1015, 1018 & n. 1 (5th Cir.1996 );

*Papasan v. Allain,* 478 U.S. 265, 268 n. 1, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986) (explaining that judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper). However, because National Western in the action at bar does not explicitly claim reliance on that entire appraisal, this Court is reluctant to take judicial notice of the complaint and full appraisal on the record in the companion case.

ing the representations and omissions upon which this action is founded, the Offering Summary in its entirety, under the doctrine of *Cortec Industries,* is before the Court for the purposes of this motion.

The question of how much of the Appraisal is properly before the Court presents greater difficulties, for National Western admits that it received "all or portions" of the document, thus conceding that at least some portions of the Appraisal on which the Complaint is grounded may be properly before the Court. The remaining question at this point is whether, for the purposes of this motion, a reasonable determination may be made as to which portions of the Appraisal National Western's allegations actually refer to and rest upon as the source of the allegedly fraudulent information, and thus may be properly placed before the Court. Again drawing reasonable doubts and inferences in plaintiff's favor, the Court divides the issue into two components, corresponding to the two distinct theories and particular instances of actionable conduct alleged in the Complaint. Following this approach, the portions of the Appraisal setting forth information with regard to the scope of the financial obligations assumed by Sponsor and owed to the Cooperative are not before the Court. By National Western's own contradictory admissions evident in the Complaint, however, the Court will deem some portions of the Appraisal that relate to the fair market value of the Property as part of the record of this motion. These matters are described in more detail below. On the basis of the record so constructed, the Court proceeds to examine the sufficiency of the Complaint as to each of the legal theories and factual grounds upon which it is founded and challenged.

### C. *Dismissal for Failure to State a Claim*

### 1. *Texas Securities Act*

The Texas Securities Act, Article 581–33(A)(2), provides that:

A person who offers or sells a security … by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, is liable to the person buying the security from him …. However, a person is not liable if he sustains the burden of proof that either (a) the buyer knew of the untruth or omission or (b) he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

■■■ Thus, the statutory elements critical to a determination about violation of the Act are the truth or falsity, actual knowledge and materiality of the representation or omission alleged to be false or misleading. The relevant inquiry for a claim narrows to "whether [defendant's] representations, taken together and in context, would have misled a reasonable investor about the nature of the investment." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 761 (2d Cir.1991). Unlike the prima facie standards applicable to common law fraud, under the Texas statute there is no requirement that plaintiff claim justifiable reliance on the representation or omission; it is enough that a false or misleading statement was made about a material fact. *See Haralson v. EF Hutton,* 919 F.2d 1014 (5th Cir.1990); *Wood v. Combustion Engineering, Inc.,* 643 F.2d 339 (5th Cir.1981).

#### a. *Sponsor's Financial Condition*

*Actual Knowledge/Falsity*

National Western's first claim of fraud rests on Merrill Lynch's alleged failure to provide information about the financial condition and obligations of the Sponsor to the Cooperative, an omission National Western asserts was material in inducing it to enter into the Transaction. To some extent, a claim resting on failure to provide information compounds the difficulty of de-

ciding whether and to what extent, based on the pleadings, plaintiff had actual knowledge of the facts omitted that constitute the particular instances of fraud.

■ Under article 581–33 A(2) of the Act, the relevant knowledge of the untruth or omission applies alternatively to the two parties to a securities transaction. It covers knowledge either by the buyer or by the seller. As applied by the Fifth Circuit, actual knowledge that would bar recovery requires that plaintiff know "of" the misleading statement or omission upon which the securities fraud claim is grounded. *See Haralson*, 919 F.2d at 1032. Unless plaintiff actually knows that a representation is false, or that existing information has been withheld, an action under the statute is not foreclosed. "And knowing that a false statement or omission has been made is not the same as knowing the true fact that was misrepresented or omitted." *Id.* The Court in *Haralson*, noting that the concept of plaintiff's constructive knowledge has no place in actions under the Texas statute, further elaborated: "We do not suggest that a purchaser has any duty to find out the truth under [article 581–33 A(2)]. Indeed, a purchaser who is actually ignorant that a seller's representation is inaccurate or incomplete may recover though the full truth is apparent from material in her possession." *Id.* at n. 10.

■ Applying these standards to guide resolution of the controversy here, the Court cannot find, solely on the basis of the pleadings, that National Western had actual knowledge of the omissions or representations relating to the financials of the Sponsor.

National Western alleges that the Offering Summary was misleading in that it failed to disclose: (1) that the Offering Plan was a non-eviction plan; (2) the practical and legal significance of that fact; (3) that the Sponsor would be required to pay indefinitely the monthly maintenance charges assessed on the 89 rent-stabilized apartments "regardless of the amount of rent received from the tenants and on the 48 vacant apartments until, if ever, those apartments were sold, whether or not such apartments remained vacant and regardless of the amount of any rent the Sponsor might collect"; and (4) the financial statements and cash flow projections of the Sponsor, while making available detailed documents about CorEast, thereby creating a false and misleading impression that only the financial condition of the servicing bank was material. (Compl.¶ 36) According to National Western, by virtue of the obligations the Sponsor incurred to support indefinitely the maintenance charges corresponding to 69% of the apartments, the financial condition of the Sponsor was a fact material to an investor's decision whether to purchase an interest in the loan on the Property, and Merrill Lynch's failure to disclose that the Sponsor lacked the resources to sustain that commitment constituted a material omission.

Merrill Lynch argues that the Offering Summary provided information sufficient to alert a reasonable investor that the Sponsor was a single-purpose entity created in connection with the conversion of the Property into a cooperative and therefore was dependent on sales of apartments in order to pay the Cooperative loan and maintenance charges. Merrill Lynch also asserts that the Appraisal offers additional details disclosing that the conversion occurred pursuant to a non-eviction plan and explaining related effects, as well as providing information and assumptions about the extent of the Sponsor's financial obligations to the Cooperative. For the purposes of this motion, because constructive knowledge of the truth of Merrill Lynch's representations or omissions cannot be attributed to National Western, which has alleged it may not have been provided the full Appraisal, the Court looks only to the information contained in the Offering Summary. On this point the Offering Summary merely identifies the Sponsor as "Gracie Associates, c/o D.B.G. Property Corp/Arrandale Management Corp./Aegis Planning, Inc.," with an address at 850

Third Avenue, New York, New York.[3] It further states that 61 units had been sold as of January 26, 1989, leaving at least 48 units (24%) vacant and available for sale and 89 units (45%) occupied by tenants, the shares corresponding to these units therefore retained by the Sponsor.

The Court finds that beyond what is disclosed in the Offering Summary, the Complaint does not otherwise acknowledge awareness by National Western of information about Sponsor's financial statements and net worth, or about the materiality and importance of that information to the National Western's decision to invest, sufficient to introduce into the record here the full scope of all factual notice contained in the Appraisal regarding the Sponsor's obligations. As to this claim, it would not be productive or dispositive to assume National Western's receipt and actual knowledge of all facts set forth in the Appraisal relevant to this issue. As the Court reads the theory of the Complaint, even if National Western had seen the entire Appraisal, it would still not have possessed alleged material documentation not set forth in either the Offering Summary or in the Appraisal. That information pertained to the actual identity, cash flow and net worth statements of the Sponsor, supported with the same or comparable level of detail as National Western asserts it was provided with respect to CorEast. Neither party has claimed that this material was ever prepared or provided. National Western could not be held to have known of the omission of documents that in fact never existed.

Nonetheless Merrill Lynch contends that whatever material National Western was provided did contain sufficient information about the Sponsor and its financial significance to the transaction to have placed a reasonable investor on "inquiry notice" as early as March 1989 to undertake further investigation that may have disclosed the representations or omissions claimed to be false or misleading. The Court disagrees. At the time of National Western's investment, because the financial statements and net worth of the Sponsor presumably were not part of the Transaction documents, as regards this claim there were no suspicious circumstances suggestive of knowing misrepresentation or fraud misconduct. *See Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 368 (7th Cir.1997). Moreover, National Western had no affirmative duty to undertake an inquiry in order to ascertain whether the information provided to it was inaccurate or incomplete. For the purposes of the Texas statute it is enough that plaintiff offer sufficient evidence that the representations or omissions were made by defendant, that they were false or misleading and that plaintiff did not know "of" the misstatements. *See Haralson*, 919 F.2d at 1032. *See also Hill York Corp.*, 448 F.2d at 695–96 ("The availability of information elsewhere does not excuse misleading or incomplete statements."). Even were National Western considered a sophisticated investor, it would not be barred from recovery under the Texas statute if it otherwise establishes the elements of a prima facie case. *See id.* at 696; *Longden v. Sunderman*, 737 F.Supp. 968, 973 (N.D.Tex.1990); *Lutheran Brotherhood v. Kidder Peabody & Co., Inc.*, 829 S.W.2d 300, 308 (Tex.App.1992, writ granted w.r.m.).

Here, Merrill Lynch does not contest that the complete financial statements and cash flows of the Sponsor were not furnished to National Western. The information undisputably supplied in the Offering Summary to National Western about the Sponsor's identity, address and financial responsibility for maintenance charges in regard to 69% of the units is not enough of itself to provide actual knowledge about

---

**3.** In an considering Merrill Lynch's earlier motion to dismiss, Judge Knapp found that this information may have indicated that the sponsor "was not being held out as an entity having any assets upon which a purchaser could rely", *National Western*, 1997 WL 328077, at *2.

matters omitted or about the true financial capacity of the Sponsor to sustain the cooperative's losses. Possessing certain information, though the full truth may be apparent from it, does not necessarily equate to knowledge that that information may be incomplete, inaccurate or misleading. *See Haralson,* 919 F.2d at 1032, n. 10. Drawing reasonable inferences in National Western's favor, National Western may fairly have assumed, and is entitled to seek to prove its theory, that it was led by Merrill Lynch's omission of the Sponsor's financials to believe that the Sponsor would be able during the short term to sell enough shares of the apartments it held, and that therefore the Sponsor's ability to sustain its obligations to the Cooperative indefinitely was not as critical. Whether or not such assumptions were reasonable or credible, and whether or not it was prudent for National Western to have proceeded with the investment on the basis of the limited information about the Sponsor it did possess, are issues of fact which cannot be adjudicated on a motion to dismiss the complaint for failure to state a cause of action. It is sufficient that National Western has stated a claim for which a set of facts exists that could entitle it to relief.

*Materiality*

■ As noted above, Merrill Lynch does not specifically dispute that the Sponsor's financial statements were not provided to National Western, although it asserts that National Western was provided sufficient information. Merrill Lynch further argues that the omission of the Sponsor's financials in the Offering Summary and Appraisal was not legally material, in that National Western could not justifiably have relied on the absence of financial statements to assume that the Sponsor would indefinitely sustain annual losses totaling $671,000 in the event it was unable to market the vacant and unsold apartments.

The issue of materiality entails judgments that often contain an inextricable mixture of fact and law, and is not one easily resolved by dispositive motions. *See TSC Indus., Inc. v. Northway Inc.,* 426 U.S. 438, 450, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Marks,* 122 F.3d at 370. The Fifth Circuit has recognized that there is a "subjective aspect" to the materiality standard in security fraud claims. *See Haralson,* 919 F.2d at 1033. With regard to a motion to dismiss, the Second Circuit has declared that "[a] fact may not be dismissed as immaterial unless it is so obviously unimportant ... that reasonable minds could not differ on the question of [its] importance." *Allen v. WestPoint–Pepperell, Inc.,* 945 F.2d 40, 45 (2d Cir. 1991) (citing *Goldman v. Belden,* 754 F.2d 1059 (2d Cir.1985)). The standard of materiality as regards an omitted fact was promulgated by the Supreme Court in *TSC Industries.* For an omission to be material, the Court said, there must be a "substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." 426 U.S. at 449, 96 S.Ct. 2126. *See also Lutheran Brotherhood,* 829 S.W.2d at 307 ("To be material, a misrepresentation or omission must have influenced the buyer's actions to the extent that the buyer would not have entered into the transaction had the representation not been made").

This Court cannot conclude, as Merrill Lynch argues, that as a matter of law there is no substantial likelihood that a reasonable jury would determine that the omission of the information about the Sponsor's financial condition National Western alleges it was not provided could not have been viewed by a reasonable investor as altering the "total mix" of the information available, or that reasonable people could not differ on the question of

its importance. Conceivably, the Sponsor's financial statements and net worth could have served to shed more light on the actual capacity of the Sponsor to sustain losses beyond the early years of the Cooperative's operation. Consequently, on the record here, the Court must reject Merrill Lynch's argument that its omission of this information was obviously unimportant, and thus legally immaterial to National Western's investment decision.

In summary, with respect to National Western's fraud claim related to the financials of the Sponsor, the Court finds numerous issues about which substantial dispute exists between the parties. On further proof, the full extent of the documents National Western actually had or did not have available may reveal whether it did possess sufficient information about the Sponsor's financials. It may or may not turn out that documentation would have altered the full scope of facts relevant to a purchaser's reaching a reasonable decision concerning the contemplated investment. Industry practice as understood by the parties and evidencing what supporting documentation is generally considered material in connection with transactions of the kind here in contention may offer guidance as to whether the Sponsor's financials should have been provided in this case. However, on a record based on the pleadings alone, the Court is not able to settle these matters. As to these contentions, National Western should be entitled to gather evidence in order to buttress its legal theory. It is not for the Court to render judgement on the merits or the credibility of National Western's allegations, or to pass upon the substance of its hypothesis. The Court's duty at this early stage of the proceedings is merely to assess the legal sufficiency of the Complaint, not to judge its implausibility. It is sufficient that some cognizable legal theory exists which would enable National Western to proceed at trial to transform pleadings into proof of its assertion that defendant's false or misleading representations or omissions entitle

National Western to relief. Consequently, as to this first allegation of Texas Securities Act violations, the Court holds that Merrill Lynch has not established "beyond doubt" that National Western could not recover on its claim at a trial on the facts disputed.

### b. *Valuations of the Property*

*Actual Knowledge/Falsity*

■ National Western's claim of fraud based on the fair market valuations of the Property presents a different set of issues. The alleged fraudulent conduct upon which this part of National Western's action is based is grounded on some claimed omissions of material facts as well as on actual representations contained in the Offering Summary and in the Appraisal, all or portions of which National Western acknowledges having been provided as inducement for its purchase of an interest in the Property. Judicial solicitude is not warranted with regard to allegations in the Complaint that on their face do not bear up to scrutiny. On a Rule 12(b)(6) motion to dismiss, the court's deference to the plaintiff's allegations assumes a *well-pleaded* complaint. The court is not obliged to accept as true claims that are self-contradictory or that the record otherwise disproves beyond doubt. *See, e.g., ALA, Inc. v. CCAIR, Inc.,* 29 F.3d 855, 859 n. 8 (3d Cir.1994) (concluding that when documents attached to a complaint contradict the allegations of the complaint, the document controls in a motion to dismiss for failure to state a claim).(cited in *Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 454 (7th Cir.1998)); 2 James Wm. Moore et al., *Moore's Federal Practice,* § 12.34[1][b] (3d ed.2000). The Court must recognize as true only *factual* allegations. It need not adopt plaintiff's pleadings expressed as conclusions of law, unwarranted deductions or subjective characterizations. *See Associated Builders, Inc. v. Alabama Power Co.,* 505 F.2d 97, 100 (5th Cir.1974) ("Conclusory allega-

tions and unwarranted deductions of fact are not admitted as true," so an allegation that a document is "materially misleading" must be supported by fact.); *Moore's,* § 12.34[1][b]. Some of the contentions National Western advances in support of its claim of fraud based on the fair market valuations of the Property suffer from a number of these infirmities.

National Western's claims are grounded primarily on the Offering Summary, which it states was provided to it and on which it relied. But National Western also asserts having received and relied on "all or portions of" the Appraisal, and bases some of its claims on information found only in the Appraisal. The documents National Western acknowledges having seen contained representations about the fair market value of the Property. The information derived from two appraisal methods that National Western maintains produced statements actionable under the Texas Securities Act in that: (1) the "Offering Summary *and the appraisal* presented a false and misleading appraisal of the fair market value of the residential condominium unit based on the estimated proceeds from the sale of shares in the Cooperative" (emphasis added); (2) the "Offering Summary failed to disclose the fair market value of the Property as a rental"; and (3) the *"appraisal* presented a false and misleading appraisal of the fair market value of the Property as a rental". (Compl. ¶ 26, emphasis added).

As regards market value based on the estimated proceeds from the sale of all the issued shares of the Cooperative (the "Future Sellout Value"), National Western affirmatively states that it reasonably relied on the figure of $41,135,000 set forth in the Offering Summary (Compl.¶ 39). Basing its allegation "upon information and belief", National Western asserts that this representation of value derived entirely from the computations contained in the Appraisal (Compl.¶ 40). Thus National Western endeavors scrupulously to avoid stating or implying in any way that it actually saw the portion of the Appraisal containing the analysis which produced the Future Sellout Value number, necessarily creating the inference that, as to this figure, National Western's theory is that the only source it relied on was the Offering Summary. By contrast, National Western asserts that the *Appraisal* stated that the fair market value of the Property as a rental building ("Rental Value") was $20,000,000 (Compl.¶ 62). Noting that the Rental Value is not presented in the Offering Summary, National Western alleges that the inclusion of the Property's Future Sellout Value and omission of the Rental Value caused the Offering Summary to be materially misleading (¶ 58).

The Complaint then elaborates the particulars that establish how these representations are allegedly false and misleading. With regard to the Future Sellout Value indicated in the Offering Summary, the complaint alleges the figure indicated in the Offering Summary misleadingly included the following:

- the proceeds of sales of shares allocated to 61 of the 198 apartments even though those shares had already been sold at the time of the cooperative conversion closing (¶ 42);

- the anticipated proceeds from the shares allocated to the 137 unsold apartments, which should not have been included because the shares corresponding to the unsold units were not collateral for the underlying loan, as the Sponsor had given a security interest in those shares to another lender (¶¶ 44–46);

- a premium attributable to the potential for conversion which should not have been included because the conversion to cooperative ownership was scheduled to close the day after the Appraisal was completed (¶¶ 48–49).

With regard to the Rental Value, the Complaint alleges that in representing the $20 million figure, the Appraisal:

- stated that in the event of a foreclosure the mortgagee would have the legal

right to rent the apartments at market rents for the sold and vacant apartments, disregarding that "as a matter of law the sold and vacant apartments would become subject to rent stabilization" (¶ 63–64);

• did not include condominium common charges of approximately $223,138 per year as an expense (¶ 65).

In deciding to purchase the interest in the loan on the Property, National Western claims it "reasonably relied on the representation in the Offering Summary as to the [$41.1 million] fair market value of the residential condominium unit" (¶ 60). But National Western also asserts that "the fair market value of the property as a rental is the only meaningful measure of the value of the property as security for a loan to a cooperative corporation" (¶ 55), and, thus, that Rental Value is "highly material to a judgment whether to purchase an interest in the loan" (¶ 56). In this regard, National Western claims it relied on the representation in the Appraisal as to Rental Value (¶ 68), concluding that had it known that the inclusion of one method of valuation and the omission of the other from the Offering Summary caused the Offering Summary to be materially misleading, National Western would not have purchased the interest in the loan.

These pleadings, some grounded on one document fully in the record of this motion, and others on unspecified portions of other material not on the record, pose for the Court a number of conceptual difficulties and dilemmas in assessing the sufficiency of the Complaint. An initial quandary is what reasonable inferences to draw from allegations that seem internally at odds. The Complaint states that National Western "reasonably relied on the representations contained in *both* the Offering Summary and the appraisal incorporated therein" (¶ 24, emphasis added) and that *both* "the Offering Summary and the Appraisal presented a false and misleading appraisal of the Future Sellout Value

(¶ 26b)". These assertions could reasonably be construed, as Merrill Lynch contends, to establish that National Western must have seen and relied on the entire Appraisal, or at minimum on the portions describing both the Future Sellout Value and the Rental Value, because the particular deficiencies described in the Complaint relating to these representations actually derive from assumptions and analysis contained in the Appraisal. Yet National Western takes pains to avoid any intimation that it relied on representations about the Future Sellout Value contained in the Appraisal. Of course, National Western cannot sustain a claim that it relied upon and was misled by affirmative representations founded in documentation which did not include particular information National Western is careful not to avow having seen, while at the same time maintaining it was misled because it acted upon that same information as actually set forth in all or portions of a document National Western admits it was provided. In other words, it is difficult to see how National Western can contend that it was defrauded both because it acted to its detriment upon information it was provided, and at the same time because it was deprived of that same information.

The apparent contradiction presents a second dilemma for the Court: which of several courses to adopt in order to resolve the conflict. Among its options are to rule that: (1) National Western should be charged with having received the entire Appraisal because (a) the document is incorporated by reference in the Offering Summary, or (b) the Court should take judicial notice of the complaint filed by National Western in the related action against the appraiser in which National Western unequivocally declares that it relied on the entire Appraisal in reaching its decision to purchase the sub-participation interest in the Property; (2) National Western's pleadings are inconsistent, and therefore National Western must be charged with having knowledge of the por-

tions of the Appraisal from which the Future Sellout Value was derived; (3) despite the seeming ambiguity, the portions of the Appraisal National Western concedes having seen did not contain the Future Sellout Value analysis and National Western's source of this representation must be accepted to have been the Offering Summary; (4) these claims should be dismissed in their entirety, as Merrill Lynch argues, for lack of the greater particularity demanded for fraud claims by Rule 9(b) of the Federal Rules of Civil Procedure, or (5) Merrill Lynch's Rule 12(b)(6) motion to dismiss should be converted into a Rule 56 motion for summary judgment in light of the materials outside the pleadings referenced by the parties in connection with this proceeding.

From among the various inferences reasonably flowing from the pleadings, the one which may be drawn in the light most favorable to, and consistent with, National Western's theory in this regard is that the information National Western cites relating to the Future Sellout Value is based only on the Offering Summary and unspecified portions of the Appraisal that National Western may have seen, and that in relying only on this representation of fair market value National Western's source of information was the Offering Summary.

But even cast in this vaguely harmonious light and propped by fair judicial inferences, National Western's ability to withstand a motion to dismiss this part of its fraud claims may be unavailing. One reason is the number of irreconcilable internal conflicts still remaining in National Western's theory. First, on this construction, National Western's pleadings would suggest that because the Offering Summary failed to mention the Rental Value, considered by National Western as a material omission, National Western was unaware of this information. But this contention cannot be taken as fact because elsewhere the Complaint explicitly states that "plaintiff reasonably relied on the representation in the Van Ancken appraisal as to the fair

market value of the residential condominium unit as a rental" (Compl.¶ 68). Second, the argument would indicate that, to the extent the Offering Summary did not contain the Rental Value, National Western was misled even if the information it considered so vital was, in fact, supplied to it by way of some other document, namely the portions of the Appraisal National Western concededly possessed, all of which the Offering Summary incorporated by reference.

Third, as so studiedly articulated in the pleadings, National Western's claim logically would imply that in deciding to purchase the sub-participation interest National Western may have relied either (1) primarily on the information contained in the Offering Summary, (2) on the Offering Summary and very limited portions of the Appraisal, or (3) on the Offering Summary only, despite other relevant material information National Western had been supplied in all or portions of the Appraisal. Fourth, National Western's allegations pertaining to the sources of the material information Merrill Lynch furnished or withheld seem internally contradictory to the extent the Complaint states, on the one hand, that the "Rental Value" (the $20 million figure National Western concedes it obtained from the Appraisal) is "the only meaningful measure of the value of the Property as security for a loan to a cooperative corporation" (¶ 55) and, on the other, that in deciding to purchase the interest in the Property, National Western "reasonably relied in the representation in the Offering Summary as to the fair market value" (the $41.1 Million Future Sellout Value) of the Property. (¶ 60) As discussed below, erecting a fraud theory founded on these incongruous grounds produces an insubstantial structure which cannot support several of the necessary elements National Western must satisfy in order to state a prima facie case under either the Texas statute or common law.

Consequently, even if National Western was not provided portions of the Appraisal

which contained the Future Sellout Value, a matter about which National Western's contradictory pleadings raises some doubt, the Court cannot accept as true or draw the inferences and conclusions National Western declares flow from these alleged representations and omissions. The fact is that to the extent National Western's theory rests on its having been provided only portions of the Appraisal, for the purposes of the Texas Securities Act, National Western may be held to have known "of" the omission of the remainder. This conclusion follows not only because the Offering Summary disclosed that a complete Appraisal existed and was available on request, but because National Western's admitted possession of only a portion of the Appraisal logically must be taken as an extension of its actual knowledge that a complete document did exist. That knowledge would also encompass notice that in some material respects the representations the full Appraisal contained about the market value of the Property, at least as reflected in the Rental Value figure, varied significantly from the valuation National Western had been furnished in the Offering Summary.

### The Future Sellout Value

National Western's theory is also unavailing in that National Western has not shown that the information about the valuations it has challenged was in fact false and misleading in the particular manner claimed. *See Calpetco 1981 v. Marshall Exploration, Inc.,* 989 F.2d 1408, 1417 (5th Cir.1993).

First, National Western's allegations assert legal conclusions not supported by law. Thus, for the purposes of this motion, the Court cannot accept such allegations as true. National Western argues that the Future Sellout Value conveyed in the Offering Summary and appraisal is false and misleading because it included proceeds from the sale of shares allocated to the 61 apartments already sold at the time of the Conversion Closing, and consequently the shares corresponding to these units could not be resold for the benefit of the Cooperative or the lenders in the event of a default on the loan. Merrill Lynch argues that this contention is legally incorrect because upon foreclosure on the Property, the mortgagee would take title to the entire condominium unit and could thus, as the highest and best use of the Property, reconvert it into a cooperative. It then would have the right to reissue and sell shares in the Property once more, even those pertaining to the 61 apartments originally sold.

Merrill Lynch's argument is an accurate representation of the legal consequences of a default by a cooperative corporation. Upon foreclosure of a cooperative corporation, the mortgagee takes title and possession to the property, effectively abolishing the ownership interest of the shareholders who had originally purchased. *See* Bruce Bergman, 3 *New York Mortgage Foreclosures* § 37.09[2][a], 37—81 (1990) (citing *Federal Home Loan Mortgage Corp. v. New York State Div. of Hous. & Community Renewal,* 87 N.Y.2d 325, 639 N.Y.S.2d 293, 662 N.E.2d 773, 775 (1995)(noting that upon foreclosure, proprietary leases of shareholders were cancelled and the share purchasers ceased ownership of their allocable shares, but that their rent protection rights were reimposed as they lost their ownership interest); and *DeSantis v. White Rose Assocs.,* 152 Misc.2d 567, 578 N.Y.S.2d 363, 367 (N.Y.Sup.Ct.1991) (declaring that upon a foreclosure and sale of premises previously converted to cooperative ownership, those occupants who were formerly proprietary lessees stand in the same position as renters—protected by New York City rent stabilization laws, which automatically become applicable as soon as a multiple dwelling is no longer owned as a cooperative.)). The purchasing shareholders effectively lose their original equity and become tenants entitled to occupancy at the legal rents. The mortgagee may then dispose of the property as it may deem appropriate, subject to New York's rent protection laws. *See id.*

Among its options is to sell the property for its highest and best use, which conceivably may still be a cooperative unit. In that event, the shares corresponding to the units of the original purchasers may be resold and the former owners would be entitled to repurchase their units, usually at preferential rates.

If the calculation of the Future Sellout Value, in fact, represents the total value of the Cooperative assuming all its shares were to be offered for sale once more following foreclosure, it would be entirely appropriate and necessary to reflect in a computation of value the estimated proceeds corresponding to all units, including the 61 previously sold. To calculate the total sellout value without taking account of the anticipated proceeds from the sale of those 61 units would have presented an incomplete picture of the building's value.

Finally, National Western's allegations in this regard are not only legally inaccurate, but are expressed as unsupported speculation and legal conclusions that do not provide enough notice, under Fed. R.Civ.P. 9(b), to state a claim for fraud. The statement, for example, that "upon information and belief" the proceeds from the sale of shares allocated to the 137 unsold apartments were "not collateral" for the underlying loan "as the sponsor had given a security interest in those shares to another lender" (Compl.¶¶ 44–46), is conclusory and demands greater particularity in a fraud allegation. On a motion to dismiss, conclusory pleadings, particularly where asserted "upon information and belief" need not be accepted as factual allegations if they are not supported by a statement of facts upon which the belief is founded. *See Campaniello Imports, Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir.1997) (citing *Luce v. Edelstein*, 802 F.2d 49, 54 n. 1 (2d Cir. 1986)). The court may on its own examine the shortcomings of such assertions, in the light of which it may accord them only the limited recognition due or dismiss them entirely if they are otherwise contradicted by facts on the record or judicially noticed.

National Western's unsupported allegation that the Sponsor may have given a security interest in shares of the Cooperative to another lender cannot support the legal or factual conclusion that the 137 unsold apartments were not collateral for the loan. Read broadly, National Western's allegation is tantamount to a charge that CorEast made a loan to the Cooperative that was unsecured for as much as 69% of the proper collateral and that this fraudulent deficiency was then passed on to Merrill Lynch and subsequently to National Western. If the security interest in question did exist, National Western might have, upon sufficiently specific pleadings, legitimate grounds to complain if that interest was in fact superior to that acquired by National Western in connection with its purchase of a sub-participation in the CorEast loan. However, both the Complaint and the Offering Summary state that the lender had a first mortgage lien on the entire 198–unit residential condominium unit (Compl. ¶ 18; Offering Summary, "Summary of Terms"). National Western cannot now argue that both its own pleading and the Offering Summary were incorrect with regard to that assertion. On the other hand, if the alleged interest existed but was subordinate—as it would have to be if in fact CorEast had a first mortgage lien—National Western has not alleged anything to substantiate a claim that any such junior encumbrance would have been material to its decision to invest. *See Haralson*, 919 F.2d at 1033 (holding that a claim of misrepresentation based on an assertion that certain stock was free and clear of all liens, when in fact the securities had been pledged as a collateral for another loan, was barred as a matter of law because the defendant could not demonstrate how the existence of a subordinate encumbrance was material to its assent to an investment agreement). National Western's bare, conclusory pleadings fail to inform of such essential facts as to the

nature of such interest, or as to the basis of National Western's belief that it existed.

Further, National Western also does not allege any facts indicating how such information, if true, would have come to the attention of an appraiser performing a real estate valuation of a property, not an accountant's audit of the financial holdings of the owner or a title search of liens against the collateral. Nor do National Western's pleadings suggest what relevance or materiality the security interest the Sponsor allegedly had previously given to another lender would have in relation to a representation incorporated in an appraiser's professional analysis and opinion. The appraiser's work product addresses only what fair value the underlying property might yield if sold in the open market. The methods appraisers use ordinarily do not involve or require an appraiser to investigate any encumbrances on the property, and a fair market value estimation as a general matter presumes unencumbered property. *See, e.g., United States v. 0.376 Acres of Land,* 838 F.2d 819 (6th Cir.1988) (discussing, in the context of an eminent domain proceeding, real estate appraisal methods to ascertain fair market value); *United States v. 320.0 Acres of Land, More or Less in the County of Monroe, State of Florida,* 605 F.2d 762 (5th Cir. 1979)(same).

■ Implicit in National Western's argument is that, in computing and rendering a projection as to fair market value, appraisers have a legal or professional duty, for which they or their clients may be held accountable in damages, to conduct title or lien searches, to disclose all discoverable encumbrances, and to factor into their assumptions the effects of such restrictions on ownership or transfers of the relevant property. No such duty exists. If sustained as law, National Western's theory would place an unwarranted burden on appraisers. Indeed, were it to prevail, appraisals of property encumbered by security interests, a class that includes most real estate, would be almost meaningless or irrelevant because automatically any limitations on conveyance imposed by such liens would materially diminish the worth of the property or render it entirely unmarketable.

*Rental Value*

The Court also cannot accept as true National Western's allegations that the failure to include the Rental Value information in the Offering Summary was a material omission making that document misleading. First, National Western's contention that it was not provided the information is contradicted by its admission in the Complaint that it relied on the Appraisal as its source of knowledge about the Rental Value. On this point, in fact, the Complaint quotes from a relevant portion of the Appraisal (Compl.¶ 63). Second, the specifics National Western cites in support of its claim that the representation was false and misleading also rest on unwarranted speculation and conclusions of law.

National Western asserts that the $20 Million Rental Value calculation is based on a false representation of New York Law with regard to residential rents permissible upon foreclosure of a cooperative. The Appraisal represented that in the event of a default and foreclosure, "the mortgagee would have the legal right to lease all the apartments at market rents." According to National Western, this statement, which the Complaint states as a direct quote, disregarded that "as a matter of law the sold and vacant apartments would be subject to rent stabilization" under New York law (Compl.¶¶ 63–64).

■ Generally, under the Texas Securities Act or common law fraud, statements of the law are not actionable as false representations of fact because both parties are deemed to have equal access to and knowledge of the law. *See Fina Supply, Inc. v. Abilene Nat'l Bank,* 726 S.W.2d 537, 540 (Tex.1987); *Executive Condominiums, Inc. v. State,* 764 S.W.2d 899, 902

(Tex.App.1989, writ denied); *see also Askew v. Smith*, 246 S.W.2d 920, 922 (Tex. Civ.App.1952, no writ). There are exceptions when the defendant has superior knowledge and uses it to mislead the plaintiff, or when a fiduciary relationship exists between the parties. *See Fina Supply, Inc.*, 726 S.W.2d at 540; *Askew*, 246 S.W.2d at 923. Also, Texas law distinguishes statements of the law of other states from statements of its own laws, so that Texas plaintiffs are not charged with knowledge of other states' laws. The general principle that all persons are presumed to know the law "does not apply to a misrepresentation concerning foreign laws, including [those] of a sister state; same being generally regarded a representation of fact." *Askew*, 246 S.W.2d at 922.

National Western's contention that, "as a matter of law," upon foreclosure a cooperative apartment reverts to rent stabilization is a legal conclusion that does not accurately reflect settled law in New York in 1989. In fact, as Merrill Lynch argues that the statement could not have been false because in 1989 the issue had not yet been decided by the New York Court of Appeals, which did not render a decisive ruling on the matter until 1995. *See Federal Home Loan Mortgage*, 87 N.Y.2d 325, 639 N.Y.S.2d 293, 662 N.E.2d 773. National Western has not pointed to any facts or authority supporting its conclusory legal statement that at the time it purchased its interest in the Property this matter was sufficiently clear or even debatable so as to make the stated representation in the Appraisal false or reckless. Accordingly, Merrill Lynch could not have known then that an assumption about the state of the law in this respect set forth in the Appraisal was false. Nor could Merrill Lynch reasonably be charged under the circumstances with recklessly disregarding whether the representation was true or false. In this event, the statement concerning the legal rents charged on occupied apartments upon foreclosure was communicated as an assumption by an independent appraiser based on what was

then reasonably known about the state of the law. It could be fairly read only as that: an assumption, not as if it were an affirmative opinion of law prepared by counsel. In fact, the very same page of the Appraisal containing the provision National Western cites verbatim (Compl.¶ 63), thus creating the presumption that the segment must have been among the portions of the Appraisal National Western reviewed at the time of its investment, contains two qualifications to the appraiser's representations about the market rents chargeable on foreclosure, conveying clearly that the information provided was intended as analytical assumptions.

The Appraisal there states that the Rental Value approach "is based on the *theory* that the current value as a rental property" is the present worth of future benefits consisting of income generated by the tenant occupied non-purchased apartments, the *"tenant occupied purchased apartments as if rented at market rents"* and the vacant apartments that are rented at market rents. (Appraisal, p. 25, emphasis added). On the same page, immediately following the text quoted by National Western, the Appraisal reiterates that the portion of the income approach dealing with the estimate of gross rent potential "is *hypothetical* in the sense that it assumes tenant purchased and vacant apartments would be rented when in fact the 61 tenant apartments are already purchased by the tenants and the 50 vacant apartments will be placed on the market for sale." *Id.* at 25–26 (emphasis added). While a real estate seller might be held liable for inducing a buyer to act in reliance upon erroneous material in an independent appraisal if it knowingly or recklessly disregarded inaccuracies or falsehoods in the report, the Court believes that on these pleadings, the inference that the assumed statement of the law was known to be false when made and intended to mislead National Western could not be sustained.

Finally, National Western's assertion that the computation of Rental Value failed to include as an expense condominium common charges of $233,138 per year is not supportable by the record as a false statement or as an omission unknown to National Western. Because National Western has acknowledged that it relied on the appraisal of Rental Value set forth in the Appraisal and alleges it is false and misleading, the Court must conclude that that information must be set forth in the portions of the Appraisal that National Western acknowledges it was provided. Consequently, the Appraisal's analysis of the Rental Value must be deemed to be before the Court on this motion. In examining the portions of the Appraisal containing the analysis of Rental Value, the Court made the following observations.

On page 25 of the Appraisal, on which the Rental Value analysis begins, the text very clearly indicates that the "property" to which the computation relates comprises the 198 residential apartments only. The starting point for the analysis, as stated in the caption, is the assumption that "the property has been sold or transferred to the Cooperative Corporation." In other words, all of the apartments comprising the Property as a whole are owned in common by the same entity, which then operates the building as rental. This fact is confirmed later in the narrative, which explicitly says "[t]his approach assumes that the building would no longer operate as a cooperative." *Id.*

Because the analysis encompasses only the residential apartments and is premised on operation as a rental building, it necessarily excludes items of income and expenses so disqualified by the stated assumptions. For this reason, the same text specifies that "[t]he commercial income is not included as part of this valuation" [be-

cause such income derives from space in the building other than the 198 rental apartments]. *Id.* And, by the same token, since the Appraisal assumes that the building is no longer functioning as a cooperative, payment of expenses that would be uniquely associated with such operation, for instance the condominium common charges here at issue, would no longer be pertinent in a computation of Rental Value. Instead, maintenance costs attributable to the parts of common spaces located within the rental property would be subsumed in the total expenses projected for operation of the entire rental property.

On this basis, an income approach appraisal of rental value would properly exclude expense items that would relate only to operation of property as cooperative/condominium. This conclusion is confirmed by the Appraisal's methodology and supporting itemization of income and expenses.

On the page setting forth the actual computation of Rental Value, as part of the heading describing the figures to represent "Projected Stabilized Year of Operation as a Rental", the caption states "*(Excluding Common Space)*". *Id.* at 28 (emphasis added). On the next page, which contains the resulting $20 million value (rounded down from $20, 238, 533), the Appraisal sets forth an itemized list of "*Operating Expenses*", earlier indicated to be for a "typical stabilized year of operation" *of the Property only, id.* at 26, thereby reaffirming the assumed exclusion of cost items not considered operating expenses associated solely with operation of the Property as rental. The analysis concludes on that page with a notation advising the reader to "[s]ee the following pages for support of market rent, expenses and overall rate." *Id.*, at 29.[4]

4. Page 35 of the Appraisal contains explanatory notes relating to expenses. There, the Appraisal states that "we have reviewed the projected expenses in the black book [the Offering Plan] and accept them as reasonable for the operation of the building as a rental."

It further refers, "for a full discussion of each expense item", to a prior version of the Appraisal and "the cooperative offering plan pages 26–41." For the purposes of this motion, however, it is not necessary to go beyond the contents of pages cited above which re-

Thus, on its face, the documentation National Western concedes it had available, or to which it had ready access, discloses that the Appraisal's assumptions and Rental Value computation explicitly excluded the expense item National Western alleges was wrongfully withheld. The material also points to other documents providing additional explanatory information that could have supplied answers regarding the basis for the exclusion of the common condominium charges from the analysis of Rental Value. Nothing on this record sustains a fair inference that on this score defendant was "hiding the ball". *See Tapia v. Chase Manhattan Bank, N.A.*, 149 F.3d 404, 410 (5th Cir.1998). The document establishes that it is nothing more than what it purports to be: an appraiser's calculation of Rental Value that excludes items not properly includable under the particular stated assumptions. That National Western may not have understood the analysis of its premises or components does not render the resulting representation of value inaccurate or incomplete or support a claim that the material is knowingly misleading. Moreover, to the extent it could be said there might have been any omission of the facts in question, National Western knew that existing Rental Value information was not included in the Offering Summary and it had knowledge of and access to material that could have explained why not and that could have supplied the information by absence of which National Western asserts it was misled. *See Haralson*, 919 F.2d at 1032 ("The statutes preclude recovery whenever a plaintiff actually knows that a representation is false or knows that existing information has been withheld."); *see also Tapia*, 149 F.3d 404.

---

flect only the text containing the Rental Value analysis upon which National Western's theory and supporting allegations rest. Merrill Lynch seeks to refute National Western's argument by pointing out that the condominium common charges in fact are reflected in the Rental Value computation by way of information in the Offering Plan indicating that

*Materiality*

National Western's claims regarding the valuations of the Property also present conflicting allegations and disparate theories with respect to the materiality of the representations and omissions in question. Moreover, the Court concludes that in some respects the particulars described in the pleadings as the grounds rendering the representations or omissions false or misleading do not cross the threshold of materiality.

The contention that the omission of the Rental Value from the Offering Summary made the documents materially false and misleading is insupportable in relation to what National Western actually knew because National Western concedes that it had actual knowledge of and relied upon the representation of the Rental Value from the Appraisal. It is tautological for National Western to argue that an omission of information from one document is material if at the same time it admits having obtained the omitted facts from another document specifically mentioned in the first. Here, under all the circumstances there could not be a substantial likelihood that "the disclosure of the omitted facts altered the 'total mix' of information made available", *see TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126 because in actuality the material fact complained of was not omitted from information National Western had available.

For the reasons described, the Court concludes National Western's claims under the Texas Securities Act relating to the valuation of the Property should be dismissed.

**2. *Common Law Fraud***

 National Western also asserts a common law fraud claim based on the

charges of $233,138 were included in the Cooperative expenses set forth in the Plan and accepted by the appraiser as the basis for the Rental Value calculation. Because the Offering Plan is not a document on the record of this motion, the Court has not considered this response.

same allegations of false and misleading representations and omissions underlying its action under the Texas Securities Act. To establish common law fraud under Texas law, a plaintiff must show that (1) a material representation was made; (2) the representation was false; (3) when the representation was made the speaker knew the representation was false or made it recklessly without any knowledge of its truth and as a positive assertion; (4) the speaker made the representation with the intent that it should be acted upon by the party; (5) the party acted in reliance upon the representation; and (6) the party thereby suffered an injury. *See, e.g., Eagle Properties, Ltd. v. Scharbauer*, 807 S.W.2d 714, 723 (Tex.1990).

Merrill Lynch moves to dismiss National Western's common law fraud claims for most of the same reasons it maintains the claims are unsustainable under the Texas Securities Act. The common law fraud standards, however, are substantially stricter in requiring additional elements of scienter and actual reliance. To make out a prima facie case, therefore, National Western therefore must satisfy a heavier pleading burden.

### a. *Knowledge and Materiality*

The analysis of the knowledge and materiality elements pertaining to the Texas Securities Act as discussed above applies equally to those requirements to the extent they are also demanded by the common law fraud cause of action. The inquiry regarding National Western's common law claims in the light of these standards therefore would be comparable and yield similar outcomes. Consequently, the Court's findings with regard to the knowledge National Western and Merrill Lynch had of representations and omissions with regard to the financials of the Sponsor and the fair market valuations of the Property, as well as the determinations of the materiality of these matters, apply to the common law claims with equal effect. The remaining inquiry for the Court is

whether, assuming National Western's common law claim were to survive the knowledge and materiality tests, superimposing the additional elements of actual reliance and scienter would serve to defeat the Complaint. In this connection, the Court, dividing National Western's claims relating to the Sponsor's financials and those relating to the valuations of the Property, decides to sustain the sufficiency of the Complaint of common law fraud as to the former and to grant the motion to dismiss as to the latter.

### b. *Intent*

The intent component of common law fraud entails an inquiry that must delve into state of mind. The requisite intent may be established by a showing that a defendant made "a false statement knowing that it was false and made it with intent to induce action." *Dowling v. NADW Mktg., Inc.*, 631 S.W.2d 726, 727 (Tex.1982). As such, the test demands a fact-intensive and subjective determination difficult to reach at the stage of a motion to dismiss where the allegations of intent are general and sweeping and where the record of supporting evidence is necessarily sparse. *See, e.g., Quinn v. Dupree*, 157 Tex. 441, 303 S.W.2d 769, 774 (1957) (finding that fraudulent intent is "to be deduced from the facts and circumstances which the law considers as mere badges of fraud", meaning it is normally a question for the trier of fact). For the purposes of this motion, an extensive analysis of this element is not necessary. First, the court notes that there is a close relation between the element of knowledge and that of scienter. A defendant cannot be charged with the required intent to defraud for making or providing representations that are either not false or not known to be false. Consequently, the examination of the knowledge element above may apply equally to bar those aspects of National Western's fraud pleadings which the Court found dismissible because the alleged representations or omissions were not false,

were known to National Western, or were not known to Merrill Lynch. Second, as described in more detail below, regardless of the state of knowledge of either National Western or Merrill Lynch about the falsity or effect of the representation or omission, the Court finds that, as regards the claim concerning the valuations of the Property, National Western could not satisfy the necessary justifiable reliance standard, independently foreclosing recovery on that ground alone.

### c. *Justifiable Reliance*

■ To sustain a common law fraud action, a plaintiff's reliance on the defendant's fraudulent conduct must be justifiable as well as actual. *Haralson*, 919 F.2d at 1025. The determination of justifiable reliance "turns on whether—given the 'fraud plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances at or before the time of the alleged fraud—it is extremely unlikely that there is actual reliance on plaintiff's part,'" *Quest Exploration and Dev. Co. v. Transco Energy Co.*, 24 F.3d 738, 742 (5th Cir.1994) (quoting *Haralson*, 919 F.2d at 1025). In this Circuit, the Court of Appeals has stated that courts here are particularly disinclined to entertain claims of justifiable reliance "where sophisticated business[es] engaged in major transactions enjoy access to critical information but fail to take advantage of that access". *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir.1984). These factors suggest that the justifiable reliance standard is also both substantially fact based and subjective, and thus difficult to adjudicate on a motion to dismiss for failure to state a cause of action.

■ Merrill Lynch argues that any reliance by National Western on the alleged misrepresentations was not justifiable, both because it believes the information was provided in as complete a form as necessary and because National Western

is a sophisticated investor that cannot claim ignorance about what the various representations meant and that must take responsibility for any failure to collect all information it needed.

National Western counters that it actually and justifiably relied both on the absence of disclosure of sponsor's financial condition, having been misled to believe that only the information about CorEast was relevant, and on the representations concerning the market value of the Property. Further, National Western claims not to have had all of the information contained in the Appraisal, so that it could justifiably rely on what it was provided.

In gauging the justifiability of National Western's reliance, as in applying the materiality requirements, the Court's inquiry must be made in the light of the "total mix" of circumstances. *See TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126 (stating that there must be a substantial likelihood that the disclosure of omitted facts would have been viewed by the reasonable investor as having altered the 'total mix' of information available).[5] The full context here, as specified in *Quest*, of plaintiff's "individual characteristics, abilities and appreciation of facts and circumstances" at the time of alleged fraud must take into account that National Western is a life insurance company based in Texas with financial abilities and appreciation of facts sufficient to enable it to effectuate the substantial institutional investment at issue here. Given whatever the state of its knowledge, experience and sophistication as an investor, National Western purchased a sub-participation interest in a mortgage loan on a converted residential cooperative building in New York City for which it paid Merrill Lynch $2.8 million, alleging reliance on Merrill Lynch's expertise and familiarity with the law and the cooperative market in New York (Compl.¶ 37). In making that investment, National Western claims it

---

**5.** The court in *Lutheran Brotherhood*, 829 S.W.2d at 307, stated that in the context of

that case "there is little, if any, difference between materiality and reliance."

proceeded on the basis of a three and one-half-page Offering *Summary* of the terms of the transaction that provided the financial statements of the servicing bank but not those of the Sponsor whose financial condition National Western now asserts was vital to what it considered the "total mix" of information available. Further, National Western posits as one theory that it may have undertaken the investment even though it may have received only undisclosed portions of an appraisal specifically referenced in the Offering Summary, without obtaining a copy of the full document which may have provided the material facts or cured the omissions by which National Western alleges it was defrauded.

Next, National Western's claims suggest that while maintaining that Rental Value is the most essential measure of market worth of a cooperative residential property, it may have grounded its investment decision on a summary of terms that omitted all mention of Rental Value, while citing a Future Sellout Value twice the amount of the rental valuation National Western concedes it had seen in portions of the Appraisal it was provided. Finally, National Western's pleadings contend that it may have accepted on face value the accuracy of the higher Future Sellout Valuation set forth in the Offering Summary and relied upon it despite (1) absence of the detailed supporting analysis National Western had available with regard to the Rental Value, (2) the vast discrepancy between the two fair market valuations produced by different appraisal methods, and (3) National Western's assertion that Rental Value is actually the "only meaningful measure of the value of the property as security for a loan to a cooperative corporation" (Compl. ¶ 55). Notwithstanding the total mix of these circumstances and their inherent incongruities, National Western's legal theory maintains that it was induced by and justifiably relied upon Merrill Lynch's various representations and omissions in proceeding to purchase an interest in the Property.

On these facts, derived from the various pleadings in the Complaint, this Court believes that National Western's theory insupportably stretches the concept of justifiable reliance. To determine justifiability, the Court must consider "whether—given the particular plaintiff's individual characteristics, abilities, and appreciation of facts and circumstances—it is 'extremely unlikely' that there was actual reliance on the plaintiff's part." *Pacific Mut. Life Ins. Co. v. Ernst & Young & Co.*, 10 S.W.3d 798, 807 (Tex.App.2000, pet.filed) (citing *Haralson*, 919 F.2d at 1026). Ordinarily, this would be a fact-based test to the extent it may depend on the plaintiff's level of sophistication. *See Roberts v. United New Mexico Bank at Roswell*, 14 F.3d 1076, 1080 (5th Cir.1994). But this Court finds that the determination may be decided as a matter of law where, as the *Haralson* standard suggests, if the record demonstrates that it would be "extremely unlikely" for *any* reasonable investor to have actually relied on particular representations. Under this predicate, a situation in which a seller provides to a prospective purchaser of a substantial financial interest only a summary of a complex transaction and omits two other documents containing information the purchaser regards as the most critical to its decision—with one of the omitted documents specifically referred to in the one transmitted—should trigger in a reasonable investor at minimum a heightened duty to inquire. National Western's decision to proceed with the Transaction notwithstanding its knowledge of the multiple deficiencies it now asserts tainted the sale raises substantial doubts as to whether the reliance it claims on the documents provided and omitted by Merrill Lynch could have been actual or justifiable.

Nevertheless, the Court remains mindful that this matter appears before it on a Rule 12(b)(6) motion to dismiss. Consequently, the Court also feels constrained to extend solicitude so as to accord the reasonable latitude owed to the Complaint

and to resolve ambiguities in the pleadings in plaintiff's favor, and thus allow National Western to proceed to discovery as to any theory that may not been ruled out beyond doubt. On the basis of this deference to the pleadings, with respect to the common law fraud claim the Court draws the same distinction it made as regards the statutory claim between the allegations relating to the omission of the Sponsor's financials and the valuations of the Property.

For the purposes of the motion, the Court accepts as sufficient National Western's pleading that it proceeded with the Transaction even without the financials of the Sponsor, on the plausible theory that it may have been led to believe that the condition of the Sponsor was not crucial since the Sponsor was expected to remain vital to the Transaction only during the short term. On this basis, because National Western was not provided the financial statements of the Sponsor, which Merrill Lynch does not dispute, National Western's reliance on the documents it was provided and the representations these materials contained may be deemed justifiable.

But, as concluded above in connection with National Western's fraud claim founded on representations and omissions relating to the valuations of the Property, the Court believes it cannot accord the same latitude to this aspect of National Western's pleadings. The Court concludes that, under all the circumstances presented here, it would be "extremely unlikely" that there would be actual or justifiable reliance on the part of any reasonable investor on the basis of the partial documentations, conflicting representations and material omissions of which National Western had knowledge and which it asserts formed the support for its investment in the Property.

### 3. *Negligent Misrepresentation*

National Western's third cause of action alleges negligent misrepresentation. Merrill Lynch's motion to dismiss does not address the claim explicitly. In a footnote in its Memorandum in support of the motion, Merrill Lynch states that National Western, in response to Merrill Lynch's initial motion to dismiss, "conceded that its claim for negligent misrepresentation is time-barred." (Merrill Lynch Memo at 2, n. 3). National Western did not dispute this contention in its response to Merrill Lynch's present motion.

Nonetheless, for the purposes of this proceeding the Court assumes that Merrill Lynch's motion to dismiss applies to the Complaint's negligent misrepresentation claim as well.

■ Under Texas law justifiable reliance is an element of a claim of negligent misrepresentation. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991).

■ The court's determination of justifiability under negligent misrepresentation is comparable to that applicable to common law fraud, requiring an inquiry as to whether it is extremely likely that, given plaintiff's individual characteristics, abilities and appreciation of facts and circumstances at the time of the alleged misrepresentation, there is actual reliance on plaintiff's part. *See Haralson*, 919 F.2d at 1026. The courts generally equate unjustifiable reliance in the negligent misrepresentation context with contributory negligence. *Id.* at 1026, n. 5 (citing *Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408, 415 (Tex.App.1986, writ ref'd n.r.e.)); *Geosearch, Inc. v. Howell Petroleum Corp.*, 819 F.2d 521, 526 (5th Cir.1987). In this respect, the justifiability element under negligent misrepresentation is stricter than it is in respect of common law fraud, which entails elements intentional conduct not implicated in negligence. Accordingly, as the court noted in *Haralson*, "a finding of unjustifiable reliance on fraudulent conduct for common law fraud purposes precludes a negligent misrepresentation claim based on the same conduct." *Id.*, at 1026, n. 5.

The Court here having found unjustifiable reliance in connection with National Western's common law fraud claim, that determination would foreclose the negligent misrepresentation action based on the same actions.

### 4. *Dismissal Under Statute of Limitations*

Merrill Lynch argues that all of National Western's fraud claims are barred by the applicable statutes of limitation.

On the record before the Court, National Western must be presumed to have become aware of the condition of the Sponsor at the time that the Cooperative missed making its mortgage payments and the servicing bank in turn failed to pay National Western on its portion of the subparticipation interest. This default, according to the Complaint, commenced in or about July or August 1991 (Compl.¶ 70). National Western further alleges having discovered "in or about 1993" that the Offering Statement was materially false and misleading, and that it learned in or about 1994 that the Appraisal was materially false and misleading in the various respects claimed. The sale of the interest in the Property occurred in March 1989. National Western's original action was commenced on May 14, 1993.

 The question of whether and when the National Western may be deemed to have had inquiry notice as to the misrepresentations it is alleging resolves the question of whether the claims are time-barred under the Texas Securities Act or under common law fraud. The limitations period under the Texas Security Act is three years from the date of discovery, but not more than five years after the date of sale. Tex.Rev.Civ. Stat. Ann. art. 581–33(H)(2)(a) and (b) (Vernon Supp.1991). The statute of limitations for common law fraud under Texas law is four years from the date of discovery. *Williams v. Khalaf*, 802 S.W.2d 651 (Tex. 1990). The date of discovery of fraud is the date upon which the plaintiff discovers

or, in the exercise of reasonable diligence should have discovered the facts that gave rise to the claim. *See Jensen v. Snellings*, 841 F.2d 600, 606 (5th Cir.1988) (finding that the limitations period begins to run when a plaintiff has "either inquiry or actual notice of the alleged fraudulent acts"); *Tapia*, 149 F.3d at 409–10 (surveying, then applying, the common determination of other circuits, including, *inter alia*, the Seventh Circuit in *Wolin v. Smith Barney, Inc.*, 83 F.3d 847 (7th Cir.1996), and the Second Circuit in *Dodds v. Cigna Sec.*, 12 F.3d 346 (2d Cir.1993), that the doctrine of equitable tolling requires that the plaintiff lack constructive as well as actual knowledge in order to be permitted to sue after the deadline in the statute of limitations has expired).

 Merrill Lynch argues that National Western's claim is time-barred because National Western had at least inquiry notice in March 1989 of all the facts alleged to have been fraudulently misrepresented. Inquiry notice requires a significant event to put a plaintiff on notice of circumstances that would alert a reasonable person to underlying facts raising the possibility of the wrongdoing plaintiff alleges. *See Jensen*, 841 F.2d at 608; *Reed v. Prudential Sec.*, 875 F.Supp. 1285 (S.D.Tex.1995), *aff'd*, 87 F.3d 1311 (5th Cir.1996); *see also Tapia*, 149 F.3d 404, 409 ("The investor who seeks to blame his investment loss on fraud or misrepresentation must himself exercise due diligence to learn the nature of his investment and the associated risks.... [That] party ... cannot close his eyes and simply wait for facts supporting such claim to come to his attention.") If, at the time of the loan transaction, the plaintiff "knew or should have known of facts sufficient to excite such inquiry as would have been made in the exercise of reasonable diligence," *In re Sioux Ltd. Securities Litigation*, 901 F.2d 51, 53 (5th Cir.1990), the Texas Securities Act's three year limitations period would have ended before the complaint was filed. Similarly, under the common law limitation the May

1993 filing would have been approximately two months too late.

If, as Merrill Lynch contends, National Western was put on notice by the Offering Summary of the Sponsor's status as a single-purpose entity possessing no other assets, as well as of the particulars that accounted for the fair market valuations of the Property, National Western must be found to have had sufficient notice for the purposes of starting the statute of limitations at the time National Western purchased its interest in the loan, in March, 1989. Alternatively, Merrill Lynch argues that even if National Western did not have notice at the beginning of the transaction, the requisite discovery "event" occurred in late 1990 or early 1991 when the Cooperative missed making its monthly payments on the loan. That default should have given National Western sufficient reason to inquire into the circumstances and to have discovered the facts about the financial condition of the Sponsor and resolved any doubts or discrepancies about the actual value of the Property.

■ The Court has already determined that, as to National Western's claim based on the omission of the financial statements of the Sponsor, National Western did not have actual knowledge at the time the Transaction was entered into in March 1989 of the information it argues constituted a material representation or omission regarding the Sponsor's condition and its importance to the transaction. If the disclosure of the financial statements of the Sponsor was standard practice in connection with the type of transaction in question, so that, by itself, an omission to produce them would have constituted a departure from the norm unusual enough to induce suspicion and excite action on the part of a reasonable investor, a larger issue would exist here relating to inquiry notice as to National Western's first fraud theory presenting a factual question not properly resolved on the present motion. Otherwise, the record evinces no momentous event contemporaneous with the Transaction to portend to National Western that it should inquire further into the ability of the Sponsor to sustain, over a term longer than reasonably may have been anticipated for the given transaction, a substantial commitment to the Cooperative. In accordance with this finding, therefore, the statute of limitations did not begin to run as to this component of National Western's fraud theory until an event that produced sufficient "storm warnings" to place plaintiff on inquiry notice. See Cook v. Avien, Inc., 573 F.2d 685 (1st Cir.1978); In re Beef Indus. Antitrust Litig., 600 F.2d 1148 (5th Cir.1979) ("Those who have learned of facts calculated to excite inquiry must inquire.") (internal quotations and citation omitted). With regard to this claim, on the record here, the alarm went off at the time the Cooperative missed making mortgage payments in late 1990 or early 1991 and National Western became aware of the default, a time that falls within the period of limitations under both the Texas Securities Act and common law.

■ With respect to National Western's claim regarding the valuations of the Property, accepting as true the allegations concerning the information National Western was provided, even if at the time of the Transaction in March 1989 National Western had no knowledge of the true facts about the matters specified in the Complaint, the numerous inconsistencies in the pleadings and flaws evident in this aspect of National Western's fraud theory may be held sufficient to give rise to inquiry notice as of March 1989. These include: (1) the transmission of the entire Offering Summary but only selected portions of the Appraisal—to the extent National Western's claim rests on its having been provided only portions of the Appraisal; (2) the omission of the Rental Value from the Offering Summary but its inclusion in the Appraisal—to the extent National Western contends that Rental Value is the only meaningful measure of fair market value in the type of transac-

tion in question; (3) the substantial difference between the Rental Value in the Appraisal and the Future Sellout Value in the Offering Summary—to the extent National Western maintains it relied primarily on the Offering Summary. These various discrepancies between representations found in documents National Western had and information contained in other materials allegedly withheld from it, but which National Western knew existed, should have sufficed to alert a reasonable investor that the circumstances demanded further inquiry. Accordingly, as of May 1993, this aspect of National Western's fraud claim would be barred under both the Texas statutory and common law.

▪ The statute of limitations applicable to negligent misrepresentation under Texas law is two years accruing from the date of the commission of the negligent act. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (Vernon 1986); *Kansa Reinsurance Co., Ltd. v. Congressional Mortg. Corp. of Tex.,* 20 F.3d 1362, 1369–1371 (5th Cir.1994). Because the instant claim was not filed until May 1993, it is time-barred.

### 5. *Dismissal Under Rule 9(b) for Insufficiency of the Pleadings*

▪ As discussed above, to satisfy the particularity requirement of Rule 9(b), a complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiff contends statements were fraudulent, state when and where statements were made, and identify those responsible for statements. *Cosmas,* 886 F.2d at 12–13. It must allege facts which give rise to a strong inference that the defendants possessed the requisite fraudulent intent. *Id.* "Allegations of fraud cannot ordinarily be based 'upon information and belief,' except as to 'matters peculiarly within the opposing party's knowledge.'" *Campaniello Imports, Ltd.,* 117 F.3d at 664 (citing *Luce,* 802 F.2d at 54).

Merrill Lynch asserts that National Western did not plead with sufficient particularity to sustain a fraud claim. As to the aspects of National Western's claims here sustained, the Court finds that the pleadings are sufficiently particular. Because National Western has alleged a material omission, it cannot be more specific as to the facts it did not receive. For this purpose, the Complaint sufficiently pleads that the Offering Summary "failed to disclose the financial statements and cash flow projections of the Sponsor" to the same extent that it included similar detailed information about CorEast, thereby plausibly conveying the false impression that the financial condition of the Sponsor was not material. Merrill Lynch's Rule 9(b) argument is thus unavailing as to this claim.

Merrill Lynch also suggests that, because scienter and intent allegations must not be based on pure speculation and conclusory allegations, the common law fraud claims must be dismissed under Rule 9(b) if National Western alleges it does not know which part of the Appraisal it received. The argument is that, while a person's state of mind (which includes intent, malice, and knowledge) may be averred generally, it may not be entirely speculative. National Western is alleging misrepresentation by material omissions, which suggests that Merrill Lynch withheld not only material information from the Offering Summary but the Appraisal or material portions of it. For the purposes of the claim relating to the financial condition of the Sponsor, the Court finds the Complaint sufficiently particularized.

## II. *MOTION FOR SUMMARY JUDGMENT*

### A. *Standard of Review*

In a summary judgment action, the party opposing summary judgment must back factual assertions by evidence that would allow "a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538

(1986). The non-moving party may not rest upon mere allegations or denials of the matters argued and supported by probative evidence accompanying the motion but must set forth countervailing proof demonstrating the existence of a genuine issue of material fact for trial.

National Western's fourth claim for relief asserts that, as a result of Merrill Lynch's superior knowledge of New York law and the New York real estate market, and because of prior trust dealings between the parties, a fiduciary relationship existed between them. Based on this relationship, National Western contends that Merrill Lynch's conduct in providing misleading information, allegedly with the intent to benefit itself without regard to the interests of National Western, constituted a breach of its fiduciary duty. Merrill Lynch moves for summary judgment on the ground that this claim is time-barred.

## B. *Breach of Fiduciary Duty*

■ The limitations period for a breach of fiduciary duty under Texas law is two years, which begins to run when the breach is committed or at the time it was discovered or "could have been discovered by the exercise of reasonable diligence." *Reed v. Prudential Sec.*, 875 F.Supp. at 1290. Merrill Lynch contends that the fiduciary duty claim is time-barred and that summary judgment is appropriate because the facts that provide National Western notice of the alleged breach are uncontroverted. Merrill Lynch argues that as of May 1991, by which time the Cooperative had missed all or part of five monthly mortgage payments and the Sponsor was in bankruptcy proceedings, there was a clear sign that the Sponsor, who was responsible for 69% of those obligations, was not able to make its maintenance payments and that the default constituted a "storm warning" prompting inquiry into the status of National Western's investment.

In support of its motion, Merrill Lynch presents an affidavit from Hans W. Weber, a former officer of National Western who claimed familiarity with the transaction by having participated in aspects of it as an assistant to Jack Howard, the senior vice president of National Western, since deceased, who was the principal in charge of the purchase. Mr. Weber attests, "National Western first became aware of difficulties with this investment in late 1990." Mr. Weber asserts that, upon Mr. Howard's departure from National Western, he assumed the role of "trouble shooter" with respect to the investment and that he recalled "being personally informed in late 1990, or at the latest, early 1991" that the Cooperative had failed to make monthly payments under the CorEast loan, and that he was "certain" that prior to May 1991 he was aware that the Cooperative had defaulted. [Weber Aff.]

National Western responds that Merrill Lynch offered "no *admissible evidence* that National Western knew that the Sponsor was in bankruptcy." Plaintiffs' Memorandum in Opposition, page 17 (emphasis in original). The default by the Cooperative in 1991, according to National Western, would not necessarily have alerted National Western to either the *Sponsor's* lack or resources in 1989 or Merrill Lynch's "overstated valuation of the collateral." Given these assertions, National Western says that summary judgment would be inappropriate because the court cannot determine as a matter of law that "a reasonable trier of fact could not fail to find that the investors either actually knew the information or should have discovered it in the exercise of reasonable diligence." Plaintiff's Memorandum at 15 (citing *Hanley v. First Investors Corp.*, 793 F.Supp. 719, 721–22 (E.D.Tex.1992)).

The Court finds that National Western has not responded with persuasive evidence contesting a material fact established by Merrill Lynch with the sworn statement of a person who had first hand knowledge about the transaction. To Mr. Weber's testimony that National Western knew about the Cooperative default prior

to May 1991, National Western answers by questioning how such knowledge could cause it to know of the Sponsor's financial weakness.

■ On a summary judgment challenge, National Western cannot merely respond with mere polemics or conclusory statements to sworn affidavits offered by Merrill Lynch. *See Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990) (stating that the purpose of summary judgment is not to "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *SEC v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978)(stating that a party opposing a summary judgment motion "may not rest upon mere conclusory allegations or denials" but "must set forth 'concrete particulars'" (citations omitted)).

■ The Court finds that the defaults by the Cooperative in late 1990 and early 1991 constituted sufficient warning to National Western, as acknowledged by Mr. Weber, to have created a duty for National Western to inquire into the circumstances surrounding the defaulted loan payments. To ignore such an alarm, or declare it insufficient would obliterate the concept of "inquiry notice," which imposes even on neophyte, non-sophisticated investors, some duty to inquire about threatening or suspicious events which may have obvious effects on the value of their investments. Given that the Cooperative had defaulted on the loan, that following a default the servicing bank was obligated for payments for only three months and would no longer do so after April 1991, and that the Sponsor's maintenance share represented almost 70% of the obligation, National Western can reasonably be charged as of April 1991 with having notice and a duty to inquire even superficially into the cause of the default which placed its investment at risk.

On the basis of Merrill Lynch's evidentiary submission, and National Western's failure to offer sufficient proof to refute the Merrill Lynch's showing that there is no genuine issue of material fact to be tried as regards the breach of fiduciary duty claim, the Court grants Merrill Lynch's motion for summary judgment on National Western's breach of fiduciary duty claim.

### CONCLUSION AND ORDER

For the reasons discussed above, it is hereby

**ORDERED** that Merrill Lynch's Rule 12(b)(6) motion to dismiss the complaint for failure to state a claim which entitles National Western to relief under the Texas Securities Act and common law fraud and negligent misrepresentation theories is (1) denied insofar as it pertains to Merrill Lynch's omission to provide the financials of the Sponsor and (2) granted as to the allegations relating to (a) the valuations of the Property and (b) negligent misrepresentation; and it is further

**ORDERED** that Merrill Lynch's Rule 56 motion for summary judgment with regard to National Western's claim of breach of fiduciary duty is granted; and it is finally

**ORDERED** that the parties are directed to proceed forthwith with the completion of pretrial discovery in contemplation of advancing to trial on the merits of the remaining issues within no longer than 60 days.

**SO ORDERED.**